**John DOE, Plaintiff,**

v.

**Gary GALLINOT, Arthur Warren, Donald Quinn, Walter Hard, Robert Oliver, Police Officers, Santa Monica Police Dept.; Velma Tamanaha, Psychiatric Nurse & Officer of the Day; Joseph del Giudice, Regional Director, Santa Monica West, a Mental Health Facility of Los Angeles County; Harry Jones, M. D., Medical Director, S. E. Stevens, M. D., Camarillo State Hospital; David Edwards, M. D., Oxnard, California, Defendants.**

No. CV 76–107F.

United States District Court, C. D. California.

Sept. 24, 1979.

Charles M. Sevilla, Chief Asst. State Public Defender, Paul D. Fogel, Joel F. Franklin, Joseph Levine, Deputy State Public Defenders, Los Angeles, Cal., for plaintiff; Kelso & Young, Los Angeles, Cal., of counsel.

George Deukmejian, Atty. Gen., Anne S. Pressman, Barbara M. Motz, Donald A. Robinson, Deputy Attys. Gen., Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION

FERGUSON, District Judge.

The plaintiff by this action challenges several portions of the California statute, the Lanterman-Petris-Short Act (LPS) (Welf. and Inst. Code §§ 5000, *et seq.*) (WIC) which provides for the involuntary civil commitment of persons to mental institutions. Jurisdiction exists pursuant to 28 U.S.C. § 1343(3), (4) and 42 U.S.C. § 1983.

He contends that under the Due Process Clause (1) the standard of gravely disabled as defined by WIC § 5008(h)(1) is unconstitutionally vague and (2) the statutory scheme under §§ 5250–5252 is unconstitutional because it does not provide minimum due process for persons involuntarily confined as being gravely disabled. He seeks a declaratory judgment pursuant to 28 U.S.C. § 2201. The court grants summary judgment for the plaintiff on the due process issue but denies the motion as to vagueness.

In order to understand the issues presented by the plaintiff, it is necessary to set forth in detail the procedures of the California commitment statute even though most of it is not challenged by this action. The court's findings of fact are set forth seriatim.

## FACTS

1. At all times herein mentioned plaintiff John Doe was a citizen of the United States and a resident of Los Angeles County, California.

2. Defendants in the instant case have acted at all times herein pursuant to WIC § 5000 *et seq.*, and under color of the law of the State of California in regard to plaintiff John Doe.

3. Acting under color of said LPS Act, defendants, and each of them, subjected plaintiff or have caused plaintiff to be subjected to a deprivation of rights, privileges and immunities secured by the Constitution of the United States.

4. Defendant Harry Jones, M. D., and his successors, have at all times herein mentioned been the person(s) ultimately responsible for administration of the LPS Act at Camarillo State Hospital (Camarillo).

5. *Mechanics of California Civil Commitment Statute*

a. Incarceration of a mentally disordered individual is first triggered when any peace officer, member of a county-designated facility's attending staff, or other designated mental health professional, upon probable cause, takes or causes to be taken the individual into custody and placed in a county-designated and State Department of Mental Health-approved facility for 72 hours of treatment and evaluation. The person who effects the original detention must state the circumstances under which he or she believes there is probable cause to support the allegation that the person is, as a result of a mental disorder, a danger to others, to himself, or gravely disabled (§ 5150). The 72-hour treatment and evaluation period may be spent at the county-designated facility or at the state hospital.

The 72-hour detention period includes weekends and holidays unless evaluation and treatment services are not available on those days (§ 5151).

b. After the 72-hour detention period, certification for an additional 14 days of intensive treatment is accomplished when the professional staff of the treating facility files a statement which attests to the fact that (1) the staff has analyzed the person and found him to be a danger to himself or others or gravely disabled; (2) the person has been advised of, but has not accepted, voluntary treatment; and (3) the facility can provide treatment (§ 5250). The statement must be signed by the professional person or his designee in charge of the treating facility and a physician, psychologist, social worker, or registered nurse who participated in the evaluation, and must be personally delivered to the person certified, his or her attorney, the public defender, if any, the district attorney, and the State Department of Mental Health, and filed with the superior court (§§ 5251, 5253). The person delivering the copy of notice of certification to the person certified for treatment must inform the latter of his right to counsel (court appointed if necessary), of his right to file a habeas corpus petition contesting the certification, and of the meaning of the term "habeas corpus" (§ 5252.1). The 14-day certification is performed ex parte, and no hearing is required or held as a matter of course to detain the person for the 14-day certification period. The burden to contest the certification decision or to seek habeas corpus rests entirely on the person who is certified, in that it is he or she who must affirmatively initiate judicial review by way of habeas corpus proceedings. Another person (public defender, relative, friend, etc.) may ask for habeas corpus on the patient's behalf.

If such review is desired, the certified person must sign a request for release form and the staff of the facility must notify the Superior Court of the request for release. A hearing on the petition must take place within two days after the petition is *filed* in the Superior Court (§ 5275). Thus, if a

patient requests habeas corpus relief on the day of certification, and if the petition is filed and a hearing scheduled on that day or the following day, five days (72 hours plus 2 days of the 14-day certification) is the *minimum* period of involuntary detention which patients committed under §§ 5150 and 5250 must endure. Such detention is accomplished without any judicial determination or opportunity whatsoever to effect and obtain judicial review of the initial commitment. In practice, this minimum period will be adhered to (1) only in cases where the person is able to arrange for and effect the filing of a habeas corpus petition within two judicial days of certification; and (2) only where superior courts are equipped to hear such petitions within two judicial days after they are filed.

c. Detention beyond the fourteenth day of the certification period can be achieved by one of four legal avenues: (1) 14-day recertification for imminently suicidal persons (§§ 5260–5264); (2) 90-day post-certification for imminently dangerous persons (§ 5300); (3) 30-day temporary conservatorship (§ 5352.1); or (4) one-year conservatorship (§ 5350). The first avenue is effected identically to original certification, without mandatory judicial review. The last three avenues have some provision for judicial review, but the temporary conservatorship is effected ex parte without his presence or participation. This conservatorship may be extended for up to six months if a "regular" year-long conservatorship is sought (§ 5350). "Gravely disabled" is the only substantive category for which conservatorship may be established. Dangerousness to self or others may make a patient eligible for the other categories of involuntary commitment.

6. In February of 1975, plaintiff John Doe was a resident of Venice, California. At that time, he owned and managed several apartment buildings. Doe obtained his undergraduate degree from the University of Southern California, and he holds a Master's Degree in economics from the University of Illinois.

7. On February 27, 1975, Santa Monica Police Officer Gary Gallinot and Ms. Velma Tamanaha, a psychiatric nurse at Santa Monica Mental Health West, were acting under color of state law in enforcing WIC § 5150 with respect to plaintiff herein.

8. On February 27, 1975, plaintiff parked his car at the Crown Parking Facility, located at 1331 22nd Street in the City of Santa Monica. The facility is located near St. John's Hospital. Plaintiff took his keys after leaving the locked car in the parking lot. He walked to St. John's Hospital because he thought that his girlfriend might be there. He inquired at the hospital's information desk to that effect. When he was unable to locate her, he returned to his car.

9. Responding to a call regarding a vehicle parked in a driveway, Officer Gary Gallinot of the Santa Monica Police Department arrived at the parking facility at 9:45 a. m. and observed plaintiff. Plaintiff appeared to be very shy and apprehensive. As Officer Gallinot approached plaintiff, he began to run away from the officer. At that time, plaintiff Doe was neither under arrest nor being detained by Officer Gallinot. Doe reentered St. John's Hospital and was pursued by the officer. Doe requested that Gallinot leave him alone and said that he did not want to die. When asked to produce valid identification, Doe properly identified himself. He then began talking in circles of mental telepathy and of people dying. At this juncture, Santa Monica Police Officers Warren and Quinn arrived. Upon conversing with Doe, Officer Gallinot concluded that Doe should be transported to Santa Monica Mental Health West, a designated county mental health facility. The officer determined that plaintiff was unable to care for his own safety or the safety of others, and was unable to drive a vehicle on the city streets. Plaintiff was handcuffed, placed in a police vehicle, and transported to the above-mentioned facility.

10. Upon arrival at Santa Monica West, plaintiff was examined and interviewed in the police vehicle by Velma Tamanaha, a psychiatric nurse. Ms. Tamanaha was em-

powered to authorize persons for 72-hour detentions. She evaluated the mental condition of plaintiff and completed an application for his transport and admission to Camarillo State Hospital. In concluding that plaintiff was "gravely disabled" and needed hospitalization, Tamanaha reported that Doe was "extremely delusional, confused, [and] paranoid, [and that he] appear[ed] potentially explosive." Ms. Tamanaha arranged for plaintiff's transfer to Camarillo State Hospital by ambulance at approximately 10:30 a. m. on the same day.

11. Plaintiff was transported by ambulance in full restraints and arrived at Camarillo at approximately 11:40 a. m. the same day. Approximately one hour later, Dr. David Edwards, M. D., placed plaintiff into seclusion and ordered that he be administered 100 mg. of Thorazine, 4 mg. of Stelazine, and 1/150 gr. of Hyoscine, to be given intramuscularly every four to six hours. Sometime thereafter, Dr. J. Rule, M. D., modified the abovementioned order so that plaintiff received 200 mg. of Thorazine four times a day, 10 mg. of Stelazine three times a day, and 25 mg. of Prolixin Enanthate. On the following day, plaintiff was admitted to Unit 16 of the hospital. His medication was changed as follows: Drs. S. E. Stevens and J. Rule ordered that plaintiff Doe be administered 200 mg. of Thorazine orally four times a day, 100 mg. of Thorazine intramuscularly every four to six hours as needed for agitation, and 15 gr. of Chloralhydrate for sleep as needed. This medication order remained in effect until March 7, 1975. On March 7, 1975, Dr. R. Cornell ordered that plaintiff's medications be augmented with 5 mg. of Haldol intramuscularly every hour as needed. Plaintiff was in fact administered 200 mg. of Thorazine orally every four hours daily from February 28, 1975 up to and including 8 p. m. on March 10, 1975.

12. During the first few days at the hospital, the staff noted that plaintiff was hostile and threatening, and that on several occasions he had requested to have his medication changed. On at least three occasions, plaintiff was administered the 100 mg. of Thorazine intramuscularly for agitation, based on his threats to other patients.

13. Plaintiff's detention under § 5150 lasted some 120 hours, since at that time, the weekend which intervened during the 72-hour period of detention permitted by § 5150 was "not counted" in the 72-hour computation. (WIC § 5151 (1967 version)). Section 5151 was amended in 1978 to include weekends and holidays in the computation of the 72-hour period.

14. On March 4, 1975, Dr. Stevens certified plaintiff Doe pursuant to § 5250 for an additional 14 days of intensive treatment. It was alleged that as a result of a mental disorder, plaintiff was "gravely disabled" as defined in § 5008(h)(1). Douglas J. Wachowiak, Psychiatric Technician, and Dr. Stevens, Unit Physician, signed the Notice of Certification. Mr. Wachowiak completed and signed a statement that plaintiff had been informed of his legal right to judicial review by habeas corpus, and that the term "habeas corpus" had been explained to him, including his right to court-appointed counsel pursuant to § 5276. Mr. Wachowiak noted that plaintiff requested judicial review, and that plaintiff refused to "sign the writ."

15. On March 7, 1975, plaintiff appeared in the Superior Court of Ventura County pursuant to his request for judicial review by habeas corpus. Plaintiff was represented by the Public Defender of Ventura County. The hearing on his petition was continued to Tuesday, March 11, 1975, in order for plaintiff to secure private counsel. The deputy public defender noted that plaintiff had been heavily sedated and requested that he not be so sedated within 72 hours of his next court appearance. The court requested of Dr. Lyons, M. D., the hospital psychiatrist appearing on behalf of Camarillo, that a modification of medication be considered. Irrespective of this request, plaintiff's medication records reflect that he was administered 200 mg. of Thorazine four times on March 10, 1975, and as late as 8 p. m. on that date, some 17½ hours before his next court appearance.

16. On March 11, 1975, plaintiff appeared in the above-mentioned superior

court with his privately retained counsel, Marvin Weiss. The court granted his petition for writ of habeas corpus. Plaintiff was thereupon ordered released, and was ultimately released from Camarillo on March 12, 1975, a full 14 days after his initial contact with Officer Gallinot in Santa Monica. Although plaintiff was finally afforded habeas corpus review of his certification, the statute's failure to provide him with mandatory review of his 14-day certification on March 4, 1975, resulted in seven days of additional involuntary detention and drugging.

17. The circumstances of plaintiff's detention illustrate an important procedural deficiency in California's civil commitment scheme: the heavy burden of contesting the 14-day certification rests entirely with the patient. While he is most likely under the effects of tranquilizing medication, the patient must often rely on the hospital treatment staff or other hospital employees for an explanation of his rights and for access to the superior court. In counties and/or facilities without an independent patients' rights advocacy system, this may be the only explanation of these rights.

18. Since his February-March, 1975 commitment to Camarillo, plaintiff has been involuntarily confined at California state hospitals pursuant to the LPS Act on six separate occasions.

19. *Camarillo State Hospital Procedures.*

a. No documentation exists to show how thoroughly the explanation of the rights of habeas corpus and counsel was perfected for any of the 3,200 patients certified under § 5250 in 1975 and 1976.

b. When the Executive Director of Camarillo was asked to provide a description of what procedures exist to inform certified persons of their legal rights, he referred only to two administrative directives. These internal memoranda, which outline to Camarillo's employees the judicial review rights available to patients, provide no assurance that patients so certified will understand their habeas corpus rights. The portion of the 1975 directive entitled "Judicial Review" states:

Any person detained involuntarily under [§ 5250] is entitled to the following review:

1. To a hearing on a writ of habeas corpus at any time while detained for 14 days intensive treatment or 14 days additional treatment. Use form MH 1537.

a. Each patient must be informed of this right at the time he is certified for intensive treatment.

b. Each such request will be witnessed by the employee to whom it is given and forwarded immediately to the Movement Population Desk where it will be forwarded to the Superior Court of Ventura County as soon as possible.

Effective January 22, 1976, the phrase "Movement Population Desk" was replaced by "legal desk in central medical records." This modified directive is currently effective. Copies of hospital administrative directives are maintained at each treatment unit. The individual at each unit having custody of the directives has the responsibility to inform others within his or her unit of the availability and contents thereof.

c. No administrative directive defines the term "habeas corpus," even though the staff member delivering a copy of the notice of certification is required by statute to thoroughly explain this term. (§ 5252.1). No administrative directive outlines the right to counsel which patients will have at the time of the hearing on any petition for writ of habeas corpus (cf. §§ 5252.1, 5276).

d. At the time of plaintiff's certification, no written guidelines were followed in administering medication. Moreover, *no* procedures exist to review a physician's determination that a patient should be certified under § 5250.

e. No independent, non-Department of Mental Health agency informs Camarillo patients of their right to judicial review.

f. According to Dr. Harlan G. Fuller, Medical Director of Camarillo State Hospital, approximately 25 percent of the patients certified under § 5250 do not comprehend the explanation of their habeas corpus rights.

20. *Ventura County Court Operations*

a. Although a patient's request for release is deemed the filing of a petition for writ of habeas corpus in Ventura County Superior Court, that court convenes only on Tuesdays and Fridays of the normal business week. Even then, some patients who request judicial review of their certification do not receive a hearing until three or four judicial days after the petition for habeas corpus is deemed filed.

b. The hearings on Ventura County petitions are held in the City of Ventura at the County Mental Health Department, a substantial distance from Camarillo State Hospital. And, even though patients are entitled to the presence of the certifying physician and of the professional person in charge of the facility, the practicalities of this distance dictate that one forensic staff member (with little or no knowledge of the particular case) testify on the basis of other staff members' contact with all patients under review that day.

c. The vast majority of patients are under medication when they come to court, a condition which inhibits their ability to participate in the proceedings.

21. *Camarillo State Hospital Statistics: Calendar Year 1975*

Ninety-six percent of the patients certified pursuant to § 5250 had an element of grave disability in their diagnosis. Thirty-five percent asked for judicial review by writ and 6% were ultimately successful in obtaining review. Twenty-three percent of the patients certified were released during the 14-day certification period and an additional 11% were released on the last day of the certification period. A total of 60% of the patients (100 − (6 + 23 + 11)) were thus detained beyond the 14-day period. More importantly, of the 3,663 persons originally involuntarily admitted to the hospital on 72-hour holds, only 956 (27 percent), were eventually detained beyond the fourteenth day of their original certification. This statistic reveals that once judicial review is mandated (as it is in at least three of the four categories of commitment beyond the fourteenth day of certification),

such review results in a significant number of patients being released. The figures also reveal that in 1975, only about 35 percent of the patients certified received such judicial review, even though approximately 60 percent of the patients certified remained incarcerated as a result of some form of judicial commitment.

22. *Camarillo State Hospital Statistics: Calendar Year 1976*

Ninety-eight percent of the patients certified pursuant to § 5250 had an element of grave disability in their diagnosis. Eighty percent asked for judicial review by writ and 12% were ultimately successful in obtaining release. Twenty-two percent of the patients certified were released during the 14-day certification period and an additional 16% were released on the last day of the certification period. A total of 50% of the patients (100 − (12 + 22 + 16)) were thus detained beyond the 14-day period. This is a 10% drop from the 1975 figure of 60%.

Of the 4,184 persons originally admitted involuntarily to the hospital, only 798 (19 percent), were eventually detained beyond the fourteenth day of their original certification.

23. *Los Angeles County Statistics: 1975*

Los Angeles County Superior Court Department 95 is the court which hears all writs which are filed from public and private psychiatric facilities in Los Angeles County as well as some writs filed by Los Angeles County residents who have been certified for 14 days of treatment at Camarillo State Hospital. Of the approximately 1,750 habeas corpus writs filed pursuant to §§ 5275–5276 in Department 95 of the Los Angeles County Superior Court in calendar year 1975, nearly 50% resulted in the patient's release prior to or at the court hearing. The 50% figure is calculated by adding the percentage of patients filing writs who were discharged *prior* to court hearing (19%), to the percentage of patients whose writs were granted (30%).

The breakdown between Los Angeles County facilities and Camarillo reveals the following:

Fifty-six percent of the writs from Los Angeles County facilities resulted in the patient's release (22% pre-hearing discharges plus 34% writs granted).

Twenty-nine percent of the writs from Camarillo State Hospital resulted in the patient's release (10% pre-hearing discharges plus 19% writs granted).

24. *Enforcement of the "Gravely Disabled" Standard*

a. The term "gravely disabled" is defined in WIC § 5008(h)(1) as a "condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter."

b. Neither Officer Gallinot nor Velma Tamanaha, nor any other person authorized to enforce the LPS Act against plaintiff ever conducted any investigation as to whether plaintiff had food, clothing, or shelter. At the time of his encounter with police personnel at St. John's Hospital, plaintiff was dressed in normal street clothes, was carrying a wallet with his driver's license and $20 in cash, and maintained an apartment in Santa Monica which contained his own furniture and enough nourishment to provide for himself on a daily basis. He also maintained a wardrobe of clothing at the apartment.

## MOOTNESS AND STANDING

■ Plaintiff has been released from Camarillo State Hospital. Since 1975, however, he has been involuntarily committed to California state hospitals many times. Thus, there is a likelihood of his future recommitment for the 14-day period and once again, it would be impossible to challenge the action in court before his release. For these reasons, plaintiff's claim is not moot; his cause of action falls under an exception to the mootness doctrine. As was true for the plaintiff in *Coll v. Hyland*, 411 F.Supp. 905 (D.N.J.1976), even though Doe is not presently confined,

> the record establishes the likelihood that he will be recommitted perhaps a number of times in the future. Thus, the allegedly unconstitutional commitment proce-

dures could affect him and the defendants, having control of his discharge, could render the controversy moot by his release. As a result, the issue may be said to be one which is "capable of repetition yet evading review" and consequently not moot.

411 F.Supp. at 907 (citations omitted). *See also Sibron v. New York*, 392 U.S. 40, 50-54, 88 S.Ct. 1889, 1896-1898, 20 L.Ed.2d 917 (1968); *In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648 (D.C. Cir. 1973); *Suzuki v. Quisenberry*, 411 F.Supp. 1113, 1134 (D.Haw.1976). Under this exception, plaintiff's cause of action is alive.

■ He has standing to challenge the constitutionality of the gravely disabled statute and procedure on its face and as applied to him. His injury from the operation of the statute is direct; he can adequately present the constitutional issues to this court.

■ This is not a class action suit. Yet plaintiff claims standing to sue on behalf of other persons who have been, are or will be committed involuntarily under the gravely disabled standard. He contends that this standing is appropriate under the doctrine of *jus tertii*. *Jus tertii* cases are inapposite. In these cases, courts granted named plaintiffs standing to assert the rights of third persons when the exercise of these rights was dependent on a right of the plaintiff's. Here, the rights of other persons are the same as plaintiff's. While a class action may have been appropriate to assert these rights, no class certification was requested.

This court's ruling, however, does affect others. The court finds that the statutory scheme allowing for 14-day certification of persons alleged to be gravely disabled is invalid on its face. This court finds that on its face, whenever it is applied, the statute is unconstitutional because it allows the state to deprive an individual of fundamental liberty against his will without an automatic review or hearing at which the State must show probable cause for the detention. While the court finds that plaintiff has no standing to represent other persons, this

finding has only limited effect on plaintiff's presentation of the case and this court's holding. The declaratory judgment sought by the plaintiff will affect all persons committed under the gravely disabled standard.

## THE STANDARD

Plaintiff asserts that the term "gravely disabled" as defined in § 5008(h)(1) is unconstitutionally vague and overbroad because it fails to provide sufficiently precise standards for its application and generates a "chilling effect" upon the exercise of First Amendment rights. This court disagrees.

Under the LPS Act, "gravely disabled" is defined as "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing or shelter."

█ Plaintiff criticizes the statute because it does not precisely define "basic personal need" or "unable to provide." Plaintiff asserts that the definition of what is "basic" in food, clothing and shelter is left to the enforcing official's individual opinion about appropriate lifestyles. While it is certainly possible that there could be some difference in interpretation of what constitutes basic need, this court cannot say that this concept as defined in the statute is unconstitutionally vague.

Standards for commitment to mental institutions are constitutional only if they require a finding of dangerousness to others or to self. *Suzuki v. Quisenberry, supra,* at 1121–1126; *Doremus v. Farrell,* 407 F.Supp. 509, 514–15 (D.Neb.1975). *See also O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). As recognized in *Doremus,* "[t]he threat of harm to oneself may be through neglect or inability to care for oneself." 407 F.Supp. at 515. *See also Colyar v. Third Judicial District,* 469 F.Supp. 424 (D.Utah 1979).

California's "gravely disabled" standard is not too vague to meet this test. It implicitly requires a finding of harm to self: an inability to provide for one's basic physical needs. It further limits the standard to

an inability arising from mental disorder rather than other factors.

This standard is much more specific than those which federal courts have declared to be "unconstitutionally vague." *See, e. g., Stamus v. Leonhardt,* 414 F.Supp. 439 (S.D. Iowa 1976); *Doremus v. Farrell, supra; Bell v. Wayne County General Hospital,* 384 F.Supp. 1085 (E.D.Mich.1974). The standards challenged in these cases authorized involuntary commitment upon a finding that a person was "mentally ill" and either needed or would benefit from treatment. As the court explained in *Bell,* such standards are unconstitutional because they "set forth a process under which a person whose affliction, in the view of a given court, falls anywhere within a vast, uncontoured description of mental ills, is subject to both temporary and indefinite commitment, whether his particular ill presents a realistic threat of harm to himself or to others." 384 F.Supp. at 1096.

█ A finding that the gravely disabled standard is not unconstitutionally vague, however, does not mean that the risk of error in its application is minimal. Even well-intentioned persons might find that certain standards of food, clothing, and shelter are "basic," even though failure to meet them does not harm or endanger a person sufficiently to justify confinement. The standard does not expressly require a finding of dangerousness or harm. The statute even states it as an alternative to an express dangerousness standard. Furthermore, the determination of whether one's inability to care for oneself is rooted in mental disorder rather than other factors can be very difficult to make. For these reasons, there is a significant risk of erroneous application of the standard and due process requires a hearing to review probable cause for detention beyond the 72-hour emergency period.

## DUE PROCESS

Confinement in a mental institution deprives an individual of his fundamental right to liberty. From the perspective of the person who resists this confinement,

there is little to distinguish it from incarceration in a penal institution. The involuntarily committed individual does not view his detention as a kindly act of the State which will inure to his benefit. Because the mental facility is authorized to administer drugs to him against his will, detention there might be considered more severe than confinement in a penal institution.

Commitment and its consequences were recently discussed by Justice Brennan in his concurring and dissenting opinion in *Parham v. J. R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979):

> Commitment to a mental institution necessarily entails a "massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), and inevitably affects "fundamental rights." *Baxstrom v. Herold*, 383 U.S. 107, 113, 86 S.Ct. 760, 764, 15 L.Ed.2d 620. Persons incarcerated in mental hospitals are not only deprived of their physical liberty. They are also deprived of their friends, family, and community. Institutionalized mental patients must live in unnatural surroundings under the continuous and detailed control by strangers. They are subject to intrusive treatment which, especially if unwarranted, may violate their right to bodily integrity. Such treatment modalities may include forced administration of psychotropic medication, aversive conditioning, convulsive therapy, and even psychosurgery. Furthermore, as the Court recognizes, see maj. op. at 2503, persons confined in mental institutions are stigmatized as sick and abnormal during confinement and, in some cases, even after release.

(footnotes omitted).

■ Because they authorize this severe deprivation of liberty, mental health commitment statutes deserve the closest scrutiny for adequate due process safeguards. The Court in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979), stated, "the quantum and quality of the process due in a particular situation depends upon the need to serve the purpose of minimizing the risk of error. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)."

The risk of error in all mental health decisions is substantial. Even when a standard requires a specific finding of dangerousness, there is great risk of error. There are no formulas, no "elements of the offense." Determinations necessarily require subjective judgments. As Chief Justice Burger wrote in his concurring opinion in *O'Connor v. Donaldson, supra*, "[t]here can be little responsible debate regarding 'the uncertainty of diagnosis in this field and the tentativeness of professional judgment.'" 422 U.S. at 584, 95 S.Ct. at 2498.

Plaintiff does not challenge involuntary commitment under the dangerousness standard. His claim is only that due process requires a probable cause hearing prior to certification for the 14-day confinement of persons alleged to be "gravely disabled."

As discussed above, while this standard is not unconstitutionally vague, there is substantial risk of erroneous application. Commitment under the standard permits the most severe deprivation of liberty on determinations which are among the most difficult to make. Thus, a due process requirement of a probable cause hearing in this situation is a very unrevolutionary concept.

The LPS Act is among the most thoughtful and progressive in the country, and the statute's 14-day certification is not completely devoid of procedural safeguards. Notice of certification must be personally delivered to the individual, his attorney, the public defender, the district attorney, and the State Department of Health; it must also be filed with the Superior Court. (§§ 5251, 5253.) The person delivering the copy of the notice of certification must inform the detainee of his right to counsel (court appointed if necessary) and his right to file a habeas corpus petition contesting the certification. (§ 5252.1). The meaning of habeas corpus must also be explained to him.

These safeguards, however, do not assure that a person will not be certified without probable cause. The State's determination may still be unreviewed. Habeas corpus is difficult to understand. The individual may not request a hearing because of the influence of drugs or great emotional distress.

Conditioning a probable cause hearing on the request of the individual reverses the usual due process analysis in cases where potential deprivation is severe and the risk of error is great. It is inconceivable that a person could be arrested on criminal charges and held for up to 17 days without a hearing unless he requested it. Even in civil cases where the deprivation is of property rather than liberty, the State must initiate the hearing and justify the deprivation. In *Freedman v. Maryland,* 380 U.S. 51, 61–62 n., 85 S.Ct. 734, 740–741, 13 L.Ed.2d 649 (1965), the Court held that "a system of movie censorship must contain at least three procedural safeguards if it is not to run afoul of the First Amendment: (1) the censor must have the burden of instituting judicial proceedings; (2) any restraint to judicial review can be imposed only briefly in order to preserve the status quo; and (3) a prompt judicial determination of obscenity must be assured." *See also Stypmann v. City and County of San Francisco,* 557 F.2d 1338, 1344 (9th Cir. 1977), where the court held that seizure of an automobile prior to a hearing is justified only if the owner is "afforded prompt post-seizure hearing at which the person seizing the property must at least make a showing of probable cause."

The initial 72 hours of detention is justified as an emergency commitment. It is recognized that a probable cause hearing cannot be arranged immediately. This emergency commitment should continue, however, only for the length of time necessary to arrange for a hearing before a neutral party so that the existence of probable cause for the detention may be determined. *See Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972).[1] In *Lessard,* the court held that a probable cause hearing must be held after 48 hours. At least three other federal courts have found that due process requires a probable cause hearing in state mental health commitment proceedings earlier than California's 17 days. *Doremus v. Farrell, supra* (5 days); *Lynch v. Baxley,* 386 F.Supp. 378 (M.D.Ala.1974) (7 days); *Bell v. Wayne County General Hospital, supra* (5 days). In *Suzuki v. Quisenberry, supra,* the Hawaii statute required a hearing within 48 hours after commitment and in *Stamus v. Leonhardt, supra,* the court found that plaintiffs' due process rights had been violated "in that no determination as to probable cause for their initial detention was ever made. Such a hearing, when not feasible prior to custody, should be held shortly thereafter." *Id.* at 446. The court urged a "flexible approach" and cited *Doremus, Lynch* and *Bell.*

Defendants cite three cases in which federal courts upheld substantial delays in holding a hearing. *French v. Blackburn,* 428 F.Supp. 1351 (M.D.N.C.1977) (10 days), *Coll v. Hyland, supra* (20 days), and *Logan v. Arafeh,* 346 F.Supp. 1265, (D.Conn. 1972), *aff'd sub nom., Briggs v. Arafeh,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973) (45 days). All three cases addressed commitment under standards which expressly required a finding of dangerousness. The grave disability standard is not so specific, and the risk of error is greater.

The courts in *French* and *Coll* relied on *Logan* and the Supreme Court's affirmance of that case. Both the district court decision and the Supreme Court summary affirmance in *Logan* were rendered prior to the Supreme Court's decision in *O'Connor v. Donaldson, supra. O'Connor* was the first

1. This case has a complicated subsequent procedural history: *vacated and remanded on procedural grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *new judgment entered,* 379 F.Supp. 1376 (E.D.Wis.1974), *vacated and remanded for consideration in light of Huffman v. Pursue, Ltd.,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *reaff'd,* 413 F.Supp. 1318 (E.D.Wis.1976).

case to discuss the limits of *parens patriae* and impose the requirement of dangerousness. Prior to *O'Connor*, the courts were still relying on the benevolent motivation of the State to justify procedural flexibility. The district court in *Logan* wrote:

> It must be remembered that commitment has not been undertaken for the sake of penal detention. The patient is committed for treatment and care and some knowledge of his mental condition can be gained by visual observation and diagnostic tests. This takes time.

346 F.Supp. at 1269.

A probable cause hearing is not one where the State must defend a final judgment of grave disability complete with medical and psychiatric findings. A probable cause hearing requires only that the State show probable cause for confinement —i. e., probable cause for a finding of grave disability so as to justify the observation, diagnosis, etc. which the *Logan* court emphasized.

This court, like the district court in *Logan*, does not question the motivation for commitment under the gravely disabled standard. Since *O'Connor*, however, it is clear that benevolent motivation cannot be a substitute for procedural safeguards. As Chief Justice Burger wrote in *O'Connor*, 422 U.S. at 589, 95 S.Ct. at 2500, "[o]ur concepts of due process would not tolerate such a 'trade-off.'" The central question is not one of motivation but of risk of error and the procedure necessary to minimize it. This court finds that under this test, due process requires a probable cause hearing after the 72-hour emergency detention period for persons alleged to be gravely disabled. A slight delay due to intervening week-ends or holidays is permissible but in no event should the hearing occur later than the seventh day of confinement.

▇▇▇ Due process is safeguarded only by a hearing at which a person or group of persons independent of the mental hospital conducts an evaluation to determine whether there is probable cause for detaining the person. Due process does not require that this determination be made by a judicial officer. As the *Doremus, supra,* court acknowledged, due process does not mandate a judicial hearing.

The court will not at this time detail a specific procedure for securing this independent probable cause review. The State agencies responsible for the administration of the LPS Act should be permitted to present to the court a plan which they believe will provide the independent review which they believe is workable within the confines of their institutions.

IT IS THEREFORE ORDERED that the defendants lodge with this court within 45 days a plan for the independent review of probable cause for detention beyond the 72-hour emergency period of persons alleged to be "gravely disabled." Plaintiff shall have 30 days to lodge his memorandum of the plan. The court will thereafter conduct further proceedings before it makes its first order.

IT IS FURTHER ORDERED that upon motion of the Attorney General of California this memorandum opinion will be modified to set forth the correct names of the State officials to whom any order of this court shall apply as of the date that it is filed.

IT IS FURTHER ORDERED that the clerk serve copies of this memorandum opinion by United States mail upon counsel for the parties appearing in this action.