John DOE, Plaintiff-Appellee,

v.

Gary GALLINOT, et al., Defendants,

Dale H. Farabee, Director of the State Department of Mental Health; Harry Jones, M.D., S. E. Stephens, M.D., and David Edwards, M.D., Defendants-Appellants.

No. 80–5658.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1981.

Decided Sept. 10, 1981.

Paul D. Fogel, Deputy State Public Defender, Los Angeles, Cal., Joel Franklin, Deputy Public Defender, Monterey County, of counsel, for plaintiff-appellee.

Donald A. Robinson, Deputy Atty. Gen., Los Angeles, Cal., for defendants-appellants.

Before WRIGHT, POOLE and NELSON, Circuit Judges.

NELSON, Circuit Judge:·

Officials and employees of the California State Department of Mental Health appeal from the district court's decision declaring certain provisions of the Lanterman-Petris-Short ("LPS") Act[1] unconstitutional on their face and entering injunctive relief. Under the relevant provisions, persons judged to be "gravely disabled" due to mental disease may be committed to a mental institution for 72 hours on an emergency basis, and up to 14 more days for involuntary treatment, with no requirement that the state initiate a hearing before an independent tribunal to determine whether adequate cause for commitment exists. We affirm the district court's conclusion that these provisions violate the due process clause of the fourteenth amendment, and further hold that the injunctive relief entered to enforce its judgment was within its discretion.

## FACTS[2]

This is a case in which a person with apparent mental problems was committed by well-intentioned officials in reasonable accordance with the LPS Act.[3]

1. Cal.Welf. & Inst. Code §§ 5000–5466 (West 1972 & Supp. 1981).

2. The facts are fully detailed in the district court's decision. *Doe v. Gallinot*, 486 F.Supp. 983 (C.D.Cal.1979). We summarize them only briefly here.

3. The LPS Act is a comprehensive scheme providing procedures for the commitment of mentally ill persons in California. The Act eliminates indefinite commitment, removes the legal disabilities previously imposed on persons adjudged to be mentally ill, and enacts a scheme of community-based services on both a voluntary and involuntary basis. As to involuntary patients, the only category of patients of concern in this case, the Act provides for periods of detention for observation and crisis treatment of mentally disordered individuals who are dangerous to themselves, dangerous to others, or gravely disabled. Cal.Welf. & Inst. Code §§ 5150, 5250 (West 1972 & Supp. 1981).

Section 5150 provides for an initial emergency detention period of 72 hours for an individual thought to be gravely disabled. Gravely disabled is defined as "a condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter .... The term 'gravely disabled' does not include mentally retarded persons by reason of being mentally retarded alone." *Id.* § 5008(h). A person may be determined to be gravely disabled by a peace officer, a member of the staff of an evaluation facility, or other persons designated by the county, and these individuals are authorized, upon probable cause, to commit a person to a designated facility for 72-hour treatment and evaluation. *Id.* § 5150. The facility must then require the officer or other authorized individual to file a written application for detention that states that the applicant has probable cause to believe that the allegedly gravely disabled individual meets the statutory criteria for emergency detention, and the circumstances that brought the individual to the applicant's attention. *Id.* The 72-hour detention period includes weekends and holidays unless evaluation and treatment services cannot reasonably be made available at the particular facility on those days. *Id.* § 5151.

During the 72-hour period, the patient is evaluated by the staff. This is the only procedure during this period designed to assess the appropriateness of the confinement; there is no right to judicial review. A psychological evaluation is required soon after admission, *id.* § 5152 (each person admitted for a 72-hour period "shall receive an evaluation as soon after he is admitted as possible"), based on the facts in the application and on the individual's conduct during an interview. Pursuant to this evaluation, the individual either will be released if there is insufficient evidence of a mental disorder, or he will be held for the remainder of the 72-hour period. *Id.* § 5152.

On February 27, 1975, Officer Gallinot observed appellee acting apprehensively in a hospital parking lot. After speaking with him, Gallinot determined he was unable to care for himself and had him transported to a nearby mental health facility.

There, a psychiatric nurse examined and interviewed Doe and concluded he was "gravely disabled." On her certification pursuant to the Act, he was committed for 72 hours and sent to Camarillo State Hospital.[4] While there, he received regular, large doses of sedatives and psychotropic drugs.

A staff physician certified Doe for an additional 14 days of treatment and con-finement on March 4. Having been informed of his right to judicial review of the commitment decision by habeas corpus, he requested review.

Doe appeared in court on March 7 and again on March 11, when his writ was granted. He was released 14 days after his detention began.

Since then, Doe has been confined involuntarily pursuant to the LPS Act on six occasions.

He filed suit for declaratory, injunctive, and monetary relief in April, 1976. In September, 1979, on a motion for summary judgment, the district court held that the

---

At the end of the 72-hour detention, the individual can be "certified" for up to 14 additional days of intensive treatment, if all of the following conditions are met:

    (a) The professional staff of the . . . facility providing evaluation services has analyzed the person's condition and has found the person is, as a result of a mental disorder or impairment by chronic alcoholism, . . . gravely disabled.

    (b) The person has been advised of, but has not accepted, voluntary treatment.

    (c) The [county-designated] facility providing intensive treatment is equipped and staffed to provide treatment . . . and agrees to admit the person.

*Id.* § 5250.

In addition, for a patient to be certified, a notice of certification must be signed by two staff members, at least one of whom must be a physician or psychologist who performed the evaluation. A copy of this notice must be delivered personally to the patient, and supplied to the patient's attorney, the district attorney, the public defender, the State Department of Mental Health, and a person the patient may designate. *d.* § 5253. At this point, the patient has a right to petition for a writ of habeas corpus in order to obtain judicial review of his certification. In order to make this right more meaningful, the LPS Act dictates that the person delivering the copy of the certification notice to the patient must inform him of his habeas corpus right, must explain the term to him, and must inform him of his right to counsel, including court-appointed counsel. *Id.* § 5252.1. If during this period, the patient requests a writ or otherwise indicates that he wants to be released, the staff or lay person to whom he makes the request must promptly provide the certified person with a written release request form to sign, relay the form to the person in charge of the facility, who, as soon as possible, must inform the superior court of the release request. *Id.* § 5275. A hearing on the petition must then be held within two days after the writ is filed. *d.* § 5276. At the end of the 14-day period, the patient is released unless the facility applies for and receives a temporary or permanent conservatorship for the patient. *Id.* §§ 5352.1, 5350.

Therefore, if a patient requests habeas corpus relief on the first day of certification, and if the petition is filed immediately and a hearing is scheduled on the following day, five days of involuntary detention (72 hours plus two days of the 14-day certification period) is the *minimum* that these patients must endure. Any delay in the system would, of course, increase the time before a hearing is provided. If the patient does not request a writ of habeas corpus, then no hearing is held during the certification period and thus the patient may be detained for up to 17 days (72 hours plus 14 days) before any type of hearing is held.

For more detailed discussions of these provisions of the LPS Act, see *Thorn v. Superior Court*, 1 Cal.3d 666, 668–71, 83 Cal.Rptr. 600, 601–04, 464 P.2d 56, 57–60 (1970) (unanimous opinion); Tieger & Kresser, *Civil Commitment in California: A Defense Perspective on the Operation of The Lanterman-Petris-Short Act*, 28 Hastings L.J. 1407, 1407–20 (1977); Note, *"Who Says I'm Crazy?"—A Proposal for Mandatory Judicial Review of Emergency Detention in California*, 51 S.Cal.L.Rev. 695, 699–702 (1978).

4. When initially detained, Doe was dressed in normal street clothes and carried a wallet containing a driver's license and $20 in cash. He also maintained a furnished apartment, a wardrobe of clothes, and enough food to provide for himself on a daily basis. The psychiatric nurse made no inquiry as to whether Doe could provide for his basic needs, noting only that he was "extremely delusional, confused, paranoid, appear[ing] potentially explosive." 486 F.Supp. at 987.

term "gravely disabled" was not unconstitutionally vague and that the lack of a mandatory hearing for persons certified "gravely disabled" violated due process. It provided defendants a chance to develop a satisfactory program.

Those efforts were unsuccessful. They drafted legislation to amend the LPS Act which failed to pass both houses of the state legislature. Other efforts were also unavailing.

In June, 1980, Doe moved for a preliminary injunction barring confinement of "gravely disabled" persons beyond the 72-hour period without a mandatory probable cause hearing. The court granted it [5] after a hearing and the injunction took effect on November 1, 1980.

## DISCUSSION

■ The appellants press two challenges to the district court's action under review: first, that a mandatory probable cause hearing is not constitutionally required in connection with the 14-day commitment called for in the statute; and second, that the relief granted by the district court was inappropriate and beyond its jurisdiction. We shall address both contentions.[6]

### I. *Requirement for a Hearing.*

■ Involuntary commitment to a mental treatment facility implicates an impor-

---

**5.** The injunction states:

The defendants, their officers, agents, servants, employees, and attorneys, and those persons acting in concert with them, are hereby enjoined from detaining any person against his/her will, pursuant to California Welfare and Institutions Code sections 5200 et seq., under a diagnosis of "grave disability" as defined in Welfare and Institutions Code section 5008(h), for a period exceeding the 72-hour emergency detention authorized by California Welfare and Institutions Code section 5150 unless a state initiated probable cause hearing which meets the approval of this court is provided.

**6.** This court was concerned at the outset that this case might have become moot upon Doe's discharge from confinement. We are satisfied, however, that a live controversy exists and the case is not moot. "[I]t is not 'absolutely clear,' absent the injunction, 'that the allegedly wrongful behavior could not reasonably be ex-

---

tant, constitutionally-protected liberty interest of the person committed. " '[A] State cannot constitutionally confine ... a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends' without good cause." *Schlette v. Burdick*, 633 F.2d 920, 922 (9th Cir. 1980), (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407 (1975)).

■ The state may not infringe on this protected liberty interest without complying with minimum requirements of due process. *Vitek v. Jones*, 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1262–63, 63 L.Ed.2d 552, 564 (1980). As the *Vitek* Court summarized the law:

We have recognized that for the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty," *Humphrey v. Cady*, 405 U.S. 504, 509 [92 S.Ct. 1048, 1052, 31 L.Ed.2d 394] (1972), and in consequence "requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 [99 S.Ct. 1804, 1809, 60 L.Ed.2d 323] (1979); *O'Connor v. Donaldson*, 422 U.S. 563, 580 [95 S.Ct. 2486, 2496, 45 L.Ed.2d 396] (1975) (Burger, C.J., concurring). The loss of liberty produced by an involuntary commitment is more than a loss of freedom from con-

---

pected to recur.' " *Vitek v. Jones*, 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552, 561 (1980) (quoting *United States v. Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344, 349 (1968)). That Doe has been returned to confinement six times subsequent to the instance detailed here lends support to the likelihood that he is vulnerable to future confinement under the LPS Act under the disputed terms. The actual time of confinement is too short to permit judicial review to conclude before discharge. The issues presented, "capable of repetition yet evading review," are therefore only technically moot. *Sosna v. Iowa*, 419 U.S. 393, 399–400, 95 S.Ct. 553, 557–58, 42 L.Ed.2d 532, 540 (1975); *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310, 316 (1911). We retain jurisdiction to hear this appeal. *In re Ballay*, 482 F.2d 648, 651 (D.C.Cir.1973) (commitment case).

finement. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena [sic] 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual." *Addington v. Texas, supra,* [441 U.S.] at 425–426 [99 S.Ct. at 1809]. See also *Parham v. J.R.,* 442 U.S. 584, 600 [99 S.Ct. 2493, 2503, 61 L.Ed.2d 101] (1979).

*Vitek v. Jones,* 445 U.S. at 491–92, 100 S.Ct. at 1263, 63 L.Ed.2d 564.

The appellants do not take issue with these basic propositions. They argue, rather, that the procedures spelled out in the LPS Act satisfy minimum constitutional requirements of due process. Appellants argue that habeas corpus review on demand adequately protects against erroneous 14-day certifications. Thus, they point out:

> The statutory habeas corpus remedy provided by sections 5275 and 5276 guarantees a judicial hearing, with court-appointed counsel if necessary, to any person who either requests that a writ be filed or who simply indicates a desire to be released. The request may also be made by any person acting on behalf of the patient. Assistance of counsel is available for preparation of the petition. The hearing is required to be held within two judicial days after the filing of the petition.

The district court, however, found this procedure deficient because "the heavy burden of contesting the 14-day certification rests entirely with the patient." 486 F.Supp. at 988. The person on whom this burden rested would often be "under the effects of tranquilizing medication," leaving him to "rely on the hospital treatment staff or other hospital employees for an explanation of his rights and for access to the superior court." *Id.* While some procedural safeguards did exist in the Act, its provisions for notice and explanation of a detainee's right to counsel and a habeas corpus hearing

[did] not assure that a person will not be certified without probable cause. The State's determination may still be unreviewed. Habeas corpus is difficult to understand. The individual may not request a hearing because of the influence of drugs or great emotional distress.

> Conditioning a probable cause hearing on the request of the individual reverses the usual due process analysis in cases where potential deprivation is severe and the risk of error is great. It is inconceivable that a person could be arrested on criminal charges and held for up to 17 days without a hearing unless he requested it. Even in civil cases where the deprivation is of property rather than liberty, the State must initiate the hearing and justify the deprivation. . . .

> The initial 72 hours of detention is justified as an emergency treatment. It is recognized that a probable cause hearing cannot be arranged immediately. This emergency commitment should continue, however, only for the length of time necessary to arrange for a hearing before a neutral party so that the existence of probable cause for detention may be determined.

*Id.* at 993.

Our review of the adequacy of the disputed procedures is guided by well-established precedent. As the Supreme Court noted in *Parham v. J.R.,* 442 U.S. 584, 599, 99 S.Ct. 2493, 2502, 61 L.Ed.2d 101, 116–17 (1979):

> [O]ur prior holdings have set out a general approach for testing challenged state procedures under a due process claim. Assuming the existence of a protectible property or liberty interest, the Court has required the balancing of a number of factors:

> > "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administra-

tive burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), quoted in *Smith v. Organization of Foster Families*, 431 U.S. 816, 848–849, 97 S.Ct. 2094, 2111–2112, 53 L.Ed.2d 14 (1977).

Reviewing the LPS procedure in light of the first two factors, we think that the district court's concern is well-founded. The private interest of individuals committed under the LPS Act provisions is substantial, because of both the "massive curtailment of liberty" and the "adverse social consequences" resulting from commitment. *Vitek*, 445 U.S. at 491–92, 100 S.Ct. at 1262–63, 63 L.Ed.2d at 564. The district court found, with ample support in the record, that commitment decisions under the LPS Act were highly error-prone, especially where review of those decisions depended on the initiative and competence of the persons committed. Statistics cited by the district court showed that a substantial number of detainees who sought habeas corpus review under the existing procedures were discharged at or before the hearing. 486 F.Supp. at 989–90. Adoption of mandatory review procedures, therefore, promises to effect a reduction in erroneous certifications.

■ No matter how elaborate and accurate the habeas corpus proceedings available under the LPS Act may be once undertaken, their protection is illusory when a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place.[7] It is the state, after all, which must ultimately justify depriving a person of a protected liberty interest by determining that good cause exists for the deprivation. *Suzuki v. Yuen*, 617 F.2d 173, 176–78 (9th Cir. 1980). Indeed, the irony of the appellants' argument is that the more accurate the determinations of the statutory habeas corpus proceedings may be, the more irrational it is to afford those proceedings only to those in a position to request them.

■ We feel, in sum, that the record sufficiently demonstrates that a substantial private interest—a protected liberty interest—is at stake, and that a determination by an independent decisionmaker would materially reduce the number of erroneous certifications for 14-day treatment. The bare existence of optional habeas corpus review does not, of itself, alleviate due process concerns. We must, therefore, turn to the final consideration: whether the benefits of a rule requiring a hearing in every instance where 14-day certification is sought are outweighed by the added burden on the state.

The appellants argue that mandatory probable cause hearings would "have a direct effect on the ability of psychiatric hospitals and facilities to provide the maximum amount of treatment to individuals in need of it. Every hour spent by a psychiatrist or physician testifying at a probable cause hearing is an hour which could have been spent in diagnosis and treatment of mentally ill persons."

While we are mindful of the importance of these concerns, we feel they do not carry the day here. Notably, the extent of the burden mandatory hearings would entail is largely hypothetical at this stage, because

---

7. A number of sources outside the record lend credence to the district court's thesis that a patient's failure to initiate review, while it may indicate grave disability, is not conclusive on that point. The patient may be under heavy sedation and thus not alert enough to request review. *Thorn v. Superior Court*, 1 Cal.3d 666, 675, 83 Cal.Rptr. 600, 606, 464 P.2d 56, 62 (1970); *Fasulo v. Arafeh*, 173 Conn. 473, 378 A.2d 553, 555–57 (1977); *Note, supra* note 2, at 708. He may be inhibited in his surroundings, intimidated, or distrustful of the staff. *Fasulo*, 378 A.2d at 555, 557; *Note, supra* note 2, at 708–09. He may feel obliged to cooperate with the staff—the people who will control nearly every aspect of his life for some period of time. Tieger & Kresser, *supra* note 2, at 1418; *Note, supra* note 2, at 709. He may be unaccustomed to or afraid of courts and attorneys, and thus reluctant to ask for review. *Id.* at 708. It has indeed been suggested that some people with mental problems are exceptionally wary, and may be afraid of even relatively innocuous requirements such as signing the form requesting relief. *Thorn*, 1 Cal.3d at 672, 83 Cal.Rptr. 464 P.2d at 60.

the district court did not impose any specific form of hearing. The court left it to appellants to develop and implement suitable procedures, noting that any hearing need not be held before a judge or judicial officer. No more is required than an independent evaluation, by a neutral decisionmaker, of the determination to confine a person as "gravely disabled" for 14 days. Recent Supreme Court decisions indicate that a decisionmaker within the institution will often suffice. *E. g., Vitek*, 445 U.S. at 496, 100 S.Ct. at 1265, 63 L.Ed.2d 567 (independent decisionmaker need not come from outside prison or hospital administration); *Parham*, 442 U.S. at 607, 99 S.Ct. at 2506, 61 L.Ed.2d at 122 (staff physician sufficient if free to evaluate independently the need for treatment and mental and emotional condition).

■ The appellants allude ominously to the unfortunate consequences of requiring medical professionals to spend most of their time trudging joylessly from one formal hearing to another, testifying rather than treating patients. We cannot agree that the district court's order necessarily leads to such a wasteful result. We do not believe that the appellants' speculations, based on an over-formal model, suffice to demonstrate an administrative burden substantial enough to outweigh the interests served by a mandatory hearing. We lack anything more concrete. It appeared to the district court, and it appears to us, that a constitutionally adequate procedure can be implemented without an undue burden on state resources. Appellants have failed to persuade us otherwise. We thus affirm the district court's ruling that a mandatory hearing must be afforded every individual in connection with a certification for 14-day intensive treatment under the LPS Act, at which a neutral decisionmaker will verify that sufficient cause for such confinement exists.

## II. *Appropriateness of Relief.*

The appellants urge that the district court "lacked jurisdiction to enjoin all 'gravely disabled' certifications under the LPS Act." The appellants "do not dispute the jurisdiction of the lower court to enjoin all future certifications of *appellee* on the basis of grave disability unless a probable cause hearing is provided," and recognize that "a declaratory judgment as to the unconstitutionality of the certification procedure may affect all persons certified under the 'gravely disabled' standard." In their view, however, "[t]he lower court lacks jurisdiction ... to *enjoin* all certifications on the basis of grave disability within the limited scope of this private action."

We are at a loss to understand this argument. The appellants complain that "the separate counties in the State of California," under whose auspices commitments under the LPS Act may take place, "were not parties to this action" and "have not had the opportunity to introduce evidence" of "additional procedural protection." The district court's injunction order, however, does not purport to bind anyone other than defendants and their privies.[8] We agree that the court had no power over those not properly before it. It did not attempt to exercise any such power.

Similarly, the appellants protest that "plaintiff was granted no standing to assert the constitutional rights of third persons." Under those circumstances, the district court should not have granted relief beyond "an injunction prohibiting future certifications of John Doe, the plaintiff, without a probable cause hearing."

In our view, this latter concern goes primarily to the appropriateness of declaratory relief in this case rather than the scope of the injunction issued to effectuate the declaratory judgment.

■ The declaratory remedy is committed to the sound discretion of the court. *Mechling Barge Lines v. United States*, 368 U.S. 324, 331, 82 S.Ct. 337, 341, 7 L.Ed.2d 317, 322 (1961); *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct.

---

8. Whether a county hospital or other similarly situated entity or individual would be precluded from relitigating the constitutionality of these provisions is an issue we need not reach.

236, 239, 97 L.Ed. 291, 294–95 (1952); *Brill-hart v. Excess Insurance Co.*, 316 U.S. 491, 494–98, 62 S.Ct. 1173, 1175–77, 86 L.Ed. 1620, 1625–27 (1942). Whether that discretion should be exercised in a given instance is subject to more searching review by an appellate court than the "abuse of discretion" standard. *Hanes Corp. v. Millard*, 531 F.2d 585, 591–92 (D.C.Cir.1976); *McGraw-Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339, 344 (9th Cir. 1966) (appellate court may "substitute its judgment for that of the court below").

The district court found that Doe had "standing to challenge the constitutionality of the gravely disabled statute and procedure on its face and as applied to him. His injury from the operation of the statute is direct; he can adequately present the constitutional issues to this court." 486 F.Supp. at 990. We agree that Doe's action properly presented the issues upon which the district court ruled. No reason for withholding the discretionary remedy appears in the record, nor has any meritorious reason been advanced by the appellants. Rather, this case seems an entirely appropriate one in which to exercise the discretion to render a declaratory judgment on the constitutionality of the challenged statutory provisions.

Having exercised that discretion, and having declared the statutory scheme unconstitutional on its face, the district court was empowered under 28 U.S.C. § 2202 to grant "[f]urther necessary or proper relief" to effectuate the judgment. The challenged provisions were not unconstitutional as to Doe alone, but as to any to whom they might be applied. Under the circumstances, it was not an abuse of discretion for the district court to enjoin the defendants from applying them.

## CONCLUSION

We affirm the ruling of the district court that "due process requires a probable cause hearing after the 72-hour emergency detention period for persons alleged to be gravely disabled. A slight delay due to intervening weekends or holidays is permissible but in no event should the hearing occur later than the seventh day of confinement." 486 F.Supp. at 994. This hearing must be one at which a person or group of persons capable of rendering an impartial decision conducts an evaluation to determine whether there is probable cause for detaining the person. "Due process does not require that this determination be made by a judicial officer." *Id.* This ruling accords with applicable precedent, and the seven-day limit represents a responsible balance of the competing interests involved. The district court, of course, retains jurisdiction to fashion such injunctive relief as will, within its discretion, give effect to the ruling.

AFFIRMED.