[No. A096401. First Dist., Div. Two. June 20, 2002.]

EDWARD W., JR., an Incompetent Person, etc., Plaintiff and Appellant,
v.
GAIL LAMKINS, as Public Guardian, etc., Defendant and Respondent.

COUNSEL

Morton P. Cohen and Michael John Stortz for Petitioner and Appellant.

Dennis Bunting, County Counsel, Wendy Gomez Getty, Assistant County Counsel, and Geoffrey Scott Allen, Deputy County Counsel, for Defendant and Respondent.

Public Interest Law Firm, Kyra Kazantzis, James F. Zahradka; Mental Health Advocacy Project, Dan Brook, Alison Brunner; Mental Health Advocacy Services and James Preis for California Association of Mental Health Patients' Rights Advocates as Amicus Curiae on behalf of Objector and Respondent.

OPINION

KLINE, P. J.—Edward W., Jr., by his guardian ad litem, Connie Steers, appeals from the trial court's denial of his petition for a writ of mandate. Appellant challenges what he views as the Solano County Public Guardian's practice of failing to provide notice to individuals detained in psychiatric treatment facilities before obtaining temporary conservatorships to allow an additional 30 days of treatment. He argues the temporary conservatees have a due process right to notice and an opportunity to be heard before establishment of the conservatorship; prior notice is required by Probate Code section 2250, subdivision (c); the absence of notice violates his right to equal protection; and the trial court erred in concluding it had no authority to grant the requested relief.

### STATEMENT OF THE CASE AND FACTS

This action challenges the ex parte appointment of temporary conservatorships for individuals determined to be gravely disabled within the meaning of the Lanterman-Petris-Short Act (LPS) (Welf. & Inst. Code,[1] § 5000 et seq.). Under section 5150, a person who, "as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled," may be taken into custody and placed in a designated facility for 72 hours of treatment and evaluation. The person may then be certified for 14 days of intensive treatment if the evaluation determines he or she is "gravely disabled" or a danger to self or others as a result of a mental disorder, and he or she is unable or unwilling to accept voluntary treatment. (§ 5250.) At the conclusion of the 14-day period, the person may be certified for an additional

---

[1]Subsequent statutory references will be to the Welfare and Institutions Code unless otherwise specified.

period of up to 30 days of intensive treatment if he or she remains gravely disabled and unable or unwilling to accept treatment voluntarily. (§§ 5270.15, 5270.20, 5270.25, 5270.30.)

Prior to the end of these certification periods, the person in charge of the facility providing treatment may recommend establishment of a conservatorship, if the patient is "gravely disabled as a result of mental disorder" and unwilling to accept or incapable of accepting treatment voluntarily. (§§ 5350, 5352.) A temporary conservator may be appointed for no more than 30 days (§ 5352.1); a permanent conservatorship may be established for up to one year, at the end of which the conservator may petition for reappointment for successive one-year periods. (§ 5361.) When a conservatorship is sought, the proposed conservatee may be held in the facility providing intensive treatment for no more than three days beyond the designated period for intensive treatment "if the additional time period is necessary for a filing of the petition for temporary conservatorship and the establishment of the temporary conservatorship by the court." (§ 5352.3.)

A proposed temporary conservatee is entitled to five days' notice of the proceeding, unless the court orders otherwise for good cause. (Prob. Code, § 2250.)

When a petition for conservatorship is filed, the proposed conservatee has a right to demand a court hearing or jury trial on the issue of whether he or she is gravely disabled, to appear at the hearing and to be represented by counsel. (§ 5350.)[2] When a conservator petitions for reestablishment of the conservatorship, the conservatee, as well as his or her attorney, must be notified and has a right to a court hearing or jury trial on the question whether the conservatee remains gravely disabled. (§ 5362.)

On April 25, 2000, appellant was taken into custody and placed in a facility pursuant to section 5150. On April 28, appellant was certified for 14 days of intensive treatment, until May 12, 2000, pursuant to section 5250. On May 10, the professionals in charge of Telecare Solano Psychiatric Facility, where appellant was detained, recommended a one-year conservatorship and temporary conservatorship pursuant to section 5352. The recommendation stated that appellant was cooperating with oral medications but refusing to take Prolixin Decanoate medications, on which he did best in the community. Issuance of the recommendation extended the period of appellant's certification to May 15, 2000, pursuant to section 5352.3. The recommendation was received by the officer providing conservatorship investigation for Solano County, Walter Boggan, on May 11.

---

[2]When the proposed conservatee demands a court or jury trial on the issue of whether he or she is gravely disabled, the temporary conservatorship may be extended until disposition of the trial, but in no case longer than six months. (§ 5352.1.)

On May 12, 2000, the office of respondent, the Solano County Public Guardian, prepared a petition to appoint a temporary conservator and a one-year conservator for appellant under sections 5350, 5352.1 and 5353 and Probate Code section 2250. The petition stated, among other things, that appellant was "not presently receiving treatment for grave disability and [was] in need of involuntary treatment before a hearing [could] be calendared and heard for the appointment of a permanent conservator." The petition sought a waiver of the five days' notice generally required under Probate Code section 2250, subdivision (c), for appointment of a temporary conservator because "it is necessary that the proposed conservatee continue to receive treatment." The facility where appellant was receiving treatment is located about a 10-minute drive from respondent's office. Respondent testified that once a petition for appointment of a conservator had been prepared, it would take approximately one hour to personally serve the documents on an individual at the Telecare facility.

On May 15, the petition for a notice waiver was granted by the Solano County Superior Court and respondent was appointed as appellant's temporary conservator. On May 18, respondent served appellant by mail with a copy of the order appointing the conservator, a May 17 order appointing an attorney, letters of temporary conservatorship and the May 12 conservatorship petition, which ordered that five days' notice was not to be required. The documents were mailed to appellant at Telecare. By May 18, however, appellant had been transferred to the Crestwood Behavioral Center.

On May 31, 2000, appellant filed the present petition for a peremptory writ of mandate and declaratory relief against respondent, on behalf of himself and others similarly situated. Appellant requested the court to declare that "persons institutionalized under Sections 5150 or 5250, W & I Code, for whom temporary conservatorships are sought under the Welfare & Institutions Code have a right to five days written notice as is mandated by the Probate Code prior to the creation of a temporary conservatorship, or at least reasonable prior written notice of the petition for a temporary conservatorship sufficient to enable them to respond." Appellant sought an order directing respondent to "give such notice of the petition for a temporary conservatorship as is mandated by the Probate Code prior to filing petitions for a temporary conservatorship" and to inform potential conservatees in such notice that they have a right to respond to the petition. Appellant additionally requested the court to declare that "persons for whom temporary conservatorships are sought under the Welfare & Institutions Code have a right to respond to the petition for a temporary conservatorship prior to the creation of a temporary conservatorship."

On June 9, 2000, Connie Steers was appointed guardian ad litem to prosecute the present action, which was consolidated with the pending

conservatorship case. The conservatorship was terminated by the superior court on June 29, 2000, on respondent's motion.

Respondent's return to the petition for a writ of mandate was filed on July 10, 2000. Respondent argued that the issues raised in the petition were moot because appellant's conservatorship had been terminated; that appellant had not named the appropriate respondent because he was seeking to vacate an order of the superior court; that review of the trial court's order could only be obtained in a court of superior jurisdiction, and appellant had not attempted to obtain such review; that respondent did not abuse her discretion in seeking ex parte appointment of the conservator; and that Probate Code section 2250 does not violate due process or equal protection guarantees. Appellant's reply was filed on July 25, 2000.

After a hearing on August 22, the trial court determined that the issues raised in the petition were not moot;[3] that the petition pled a cause of action against respondent; that the petition was filed in the proper court; and that an evidentiary hearing was required for determination of whether appellant had other available remedies and whether respondent's conduct or Probate Code section 2250 violated appellant's constitutional rights.

The evidentiary hearing was held on May 2 and 3, 2001. Greta Jenkins testified that she was employed as a deputy public defender in Solano County from June 1998 to March 2000, during which time she handled approximately 300 conservatorship cases. Respondent was the petitioner in the majority of these cases. Jenkins estimated that about 50 to 75 of these cases were Probate Code conservatorships, approximately 25 of which involved requests for temporary conservatorships. In all of these cases, the prospective temporary conservatee was personally served with prior notice. The other approximately 250 cases Jenkins handled were conservatorships under the Welfare and Institutions Code; all of these involved temporary conservatorships and in none did the prospective conservatee receive prior personal service of notice. The reason given by the public guardian for not providing notice was the need for continuing treatment. According to Jenkins, she generally did not meet her clients until one to two weeks before the conservatorship hearing—well into the temporary conservatorship period—

[3]Respondent does not challenge the trial court's conclusion that the issues presented are not moot. Although appellant's conservatorship had been terminated by the time of the court's decision, the court was correct. From the evidence at the hearing, it appears that "conservatorships are still likely to be reestablished ex parte and, as evidenced by the amicus curiae briefs filed herein, such procedures are of great public interest. Moreover, the reestablishment issue could perpetually evade appellate scrutiny . . . ." (*Conservatorship of Moore* (1986) 185 Cal.App.3d 718, 725 [229 Cal.Rptr. 875]; see *In re Head* (1983) 147 Cal.App.3d 1125, 1130 [195 Cal.Rptr. 593].)

because she was not notified of her ex parte appointment until about a week after the fact and it took another week or more to locate the conservatee, who usually was transferred to a different facility after establishment of the conservatorship. By this time, the clients did not want to pursue a petition for writ of habeas corpus because they were close to the end of the temporary conservatorship period and hoped to be released if they did not "rock the boat" before the conservatorship hearing.

Brent Kato, an attorney specializing in elder law, testified about the procedures he follows in attempting to institute a conservatorship. He testified that it would normally take two or three days to prepare the paperwork for submission to the court, that the court prefers requests for a hearing date to be made five to seven days in advance but would schedule a hearing sooner in exigent circumstances, and that even in such exigent circumstances he would give prior notice to the proposed temporary conservatee. Kato had never had a situation in which he sought to dispense with prior notice.

Respondent testified that under the current process, the facility would recommend conservatorship about three days before the expiration of certification under a section 5150 or 5250 hold. Once a referral was received, respondent's office would review the referral, "coordinate with county counsel verbally, often, to look at the referral before we send it to them. We log it in, we complete a cover letter, we make copies, we make a file, and then it goes to county counsel." Respondent felt that a requirement of five days' prior notice to a proposed temporary conservatee would delay the process and could prevent her from acting as conservator in some cases, meaning treatment could not be authorized and the patient might decompensate. Respondent estimated that providing the five-day advance notice to proposed temporary conservatees would add an additional three hours of work per case for the investigator working on the case, plus an additional hour for attending a court hearing. Adding a court hearing at the temporary conservatorship stage would also entail testimony from mental health professionals and legal services for the conservatee.

Dr. Bruce Anderson, the medical director of the California Specialty Hospital in Vallejo, opined that it could be more difficult to care for patients, and lead to premature release of gravely disabled patients, if the public guardian was required to wait five days before submitting a petition for temporary conservatorship. He estimated that the time required for a physician to testify at a hearing before establishment of a temporary conservatorship would be a minimum of two to three hours and could be as much as half a day. Anderson estimated that the medical decision to apply for a conservatorship would be made between the seventh and fourteenth days of a 14-day hospitalization, with an effort made to avoid last-minute applications.

Dennis Dow, the facility administrator at Solano County Psychiatric Health Facility, testified that the operations of the facility would be impaired if the county conservator had to wait five days before filing a petition for temporary conservatorship. Under existing procedures, the conservatorship application was not processed and signed by the judge until the "final hours" of a section 5250 hold; if five days were added to the process, patients would have to be discharged without appropriate placements. Dow testified that the point at which his facility would decide to seek a conservatorship would vary with each patient but on average would be about seven days after the patient entered the facility.

According to the parties' stipulated facts, in the year 2000, respondent filed approximately 80 petitions to appoint temporary and one-year conservators for persons certified under sections 5250 and/or 5352.3 and filed approximately 80 petitions seeking waiver of the five-day notice under Probate Code section 2250; the Solano County Superior Court granted all 80 petitions.

On July 31, 2001, the trial court filed its findings and order after hearing, denying the petition for writ of mandate. The court ruled that Probate Code section 2250, by permitting trial courts to waive the five-day notice requirement for good cause, grants discretion to the public guardian to request such waiver; that the court lacked authority to direct a public official regarding the performance of a discretionary act; and that the court lacked authority to order another trial court judge how to act on such a request. With respect to the equal protection challenge, the court found appellant had not presented sufficient evidence "for the court to find that similarly situated mental health detainees were being treated differently based on some suspect classification." As to appellant's due process challenge, the court found "the existing statutory protections and ability to test his detention by writ afforded [appellant] are adequate, particularly when the burdens created by requiring notice and an opportunity to be heard are balanced against the additional benefits which might be conferred upon a detainee."

Appellant filed a timely notice of appeal on September 18, 2001.[4]

---

[4]On November 26, 2001, appellant filed a motion to correct the record on appeal which this court ordered would be considered with the appeal. Appellant sought correction of the record on the basis that exhibits 5, 6, 7 and 11 lacked proper evidentiary certification and exhibits 6 and 7 were sealed by the trial court. Appellant requested that this court not consider the four exhibits because they were not admitted into evidence by the trial court and that we seal exhibits 6 and 7.

The motion is denied because it is unnecessary. This court is aware that the four exhibits in question were not admitted into evidence in the trial court, no issue has been raised about this

## DISCUSSION

The LPS has been described as "scrupulously protect[ing] the rights of involuntarily detained mentally disordered persons." (*Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 534 [223 Cal.Rptr. 746].) It expressly guarantees a number of legal and civil rights, and provides that involuntarily detained patients retain all rights not specifically denied under the LPS. (§§ 5325, 5327.) It also details involuntarily detained patients' rights to notice of proceedings to certify them for treatment and to demand judicial review. The 14-day certification for intensive treatment authorized by section 5250 requires a notice of certification signed by a physician or psychologist who participated in the evaluation and by the person in charge of the facility; notice personally delivered to the person subject to certification, including notice of the right to judicial review by habeas corpus, and a certification review hearing held within four days of the date upon which the person is certified for intensive treatment, unless judicial review is requested. (§§ 5251, 5253, 5254, 5254.1.) The additional 30-day treatment period under section 5270.15 similarly requires notice personally delivered to the person to be certified and a certification review hearing within four days of the date of certification, unless judicial review is requested. (§§ 5270.15, 5270.20, 5270.25, 5270.30.) Any person certified for intensive treatment has a right to judicial review by writ of habeas corpus, with a hearing to be held within two judicial days after the petition is filed. (§ 5275.)

Conservatorship provides an additional means by which a patient may be involuntarily committed for psychiatric treatment. The Welfare and Institutions Code does not expressly describe the requirements for notice to a proposed conservatee, but does provide that, with specified exceptions, the procedure for establishing a conservatorship under the Welfare and Institutions Code is the same as that provided in division 4 of the Probate Code. (§ 5350.) The Probate Code requires that a proposed conservatee be served with notice of the petition at least 15 days before the hearing on the petition. (Prob. Code, §§ 1822, 1823, 1824.) The proposed conservatee has a right to appear at the hearing, to be represented by counsel and to demand a jury trial. (§ 5350; Prob. Code, §§ 1822-1824.) The clerk of the superior court must notify the conservatee at least 60 days before the end of the one-year conservatorship period, and if the conservator petitions to reestablish the

---

ruling, and this court has not reviewed the exhibits. Exhibits 6 and 7, medical records, were received by the trial court under seal in accordance with Evidence Code sections 1260 and 1261, unsealed by the trial court to ascertain that the affidavit of the custodian of records required by Evidence Code section 1261 was included, then resealed by the trial court. They have not since been unsealed.

conservatorship, the conservatee must be notified and is entitled to request a court hearing. (§ 5362.)

With respect to temporary conservatorships, Probate Code section 2250, subdivision (c), provides in pertinent part: "Unless the court for good cause otherwise orders, not less than five days before the appointment of the temporary . . . conservator, notice of the proposed appointment shall be personally delivered to the proposed conservatee . . . ."

Appellant's petition for writ of mandate sought to mandate prior notice of petitions for temporary conservatorships and an opportunity for the proposed conservatee to respond to the conservatorship petition. By this request for relief, the petition appears to challenge the portion of Probate Code section 2250 allowing the trial court to dispense with prior notice of a petition for temporary conservatorship on a showing of good cause. Appellant's briefing on appeal, however, makes clear that what he is challenging is respondent's alleged practice of *routinely* seeking notice waivers; appellant accepts that the court could order the notice requirement waived in exigent circumstances, where notice would be impossible or useless. Appellant does not claim that Probate Code section 2250, subdivision (c), is unconstitutional or otherwise invalid, but that respondent violates the statute by invariably requesting notice waivers as a matter of course. Nor does appellant seek a mandatory preappointment hearing for all proposed conservatees, but only notice and an opportunity to oppose the conservatorship in writing. Appellant further complains that the postappointment notice respondent provides is inadequate because it is mailed, rather than personally served, as could easily be accomplished, and does not inform the conservatee of the right to request habeas corpus review.

I.

Appellant argues that the trial court erred in concluding that it lacked authority to grant the petition for writ of mandate. He urges that the trial court had authority to grant relief because this case involved a clear duty to act in only one manner; respondent did not exercise discretion but rather followed a standard predetermined policy in seeking waivers of the five-day notice requirement; respondent abused her discretion; and appellant's constitutional rights were violated. Appellant also argues that even if he had no right to a writ of mandate, he was entitled to a declaration of statutory and constitutional rights.

The trial court concluded it had no authority to grant appellant's petition for writ of mandate because it lacked authority either to direct respondent

how to exercise her discretion or to order another trial court judge to rule on respondents' requests for waiver of notice in a particular manner. The latter issue clearly presented no bar. The only portion of appellant's petition for writ of mandate that can be construed as seeking the trial court to direct another trial judge's rulings is his request for the court to vacate his temporary conservatorship. By the time the petition was heard, however, appellant's conservatorship had been terminated, rendering this issue moot. In all other respects, appellant sought to have the trial court issue orders directed at respondent, not at another trial judge.

The trial court's conclusion that it had no authority to order respondent to exercise her discretion in a particular manner is also problematic. The trial court concluded simply that by authorizing trial courts to waive notice of a petition for appointment of a temporary conservator for good cause, Probate Code section 2250 necessarily grants discretion to the public guardian to request a waiver of the notice requirement. ■■ It is true that mandamus " 'will not lie to control the discretion exercised by a public officer.' " (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 344, fn. 24 [124 Cal.Rptr. 513, 540 P.2d 609].) ■■ Here, however, appellant's contention is that respondent is *not* exercising discretion but rather requests notice waivers in all cases in which she files petitions for appointment of a temporary conservator. To direct respondent to request notice waivers only in the circumstances authorized by Probate Code section 2250 and not routinely would not be to direct her *how* to exercise her discretion but only to exercise it.

Respondent suggests that the fact she requested notice waivers in all of the 80 petitions for appointment of a temporary conservator she filed in the year 2000 does not demonstrate she failed to use her discretion. She maintains that she "believed notice should be modified" in each of the cases. While respondent testified that her office would "review" each referral for a temporary conservatorship and "look at" it before sending it to county counsel, her testimony offered no insight into the factors that might be considered in determining whether to seek a notice waiver. Greta Jenkins, who handled approximately 250 LPS conservatorship cases as a deputy public defender in Solano County from 1998 to 2000, testified that all of these cases involved temporary conservatorships, in none did the prospective conservatee receive prior personal service of notice, and in all the reason given by respondent for not providing notice was the need for continuing treatment. The evidence that respondent sought notice waivers, for the same reasons, in every one of the petitions she filed for appointment of a temporary conservator is simply too stark to allow a conclusion that respondent was exercising her discretion rather than following a policy of seeking notice waivers in temporary conservatorship cases.

██ Moreover, respondent concedes that mandamus may lie to correct constitutional violations. (*Jolicoeur v. Mihaly* (1971) 5 Cal.3d 565, 570, fn. 2 [96 Cal.Rptr. 697, 488 P.2d 1]; *Fidelity & Cas. Co. of New York v. Workers' Comp. Appeals Bd.* (1980) 103 Cal.App.3d 1001, 1009 [163 Cal.Rptr. 339].) ██ ██ If appellant is correct that respondent's practices violate the constitutional guarantees of due process and/or equal protection of the laws, relief by means of writ of mandate would be appropriate.[5]

## II.

Under Probate Code section 2250, appellant and other prospective conservatees have a right to five days' notice before the appointment of a temporary conservator, absent a finding by the trial court of good cause to modify the notice requirement. It is this right appellant contends is violated by respondent's practice of routinely seeking notice waivers.

██ " 'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.]' " (*Conservatorship of Moore, supra,* 185 Cal.App.3d 718, 725, quoting *Mullane v. Central Hanover Bank Tr. Co.* (1950) 339 U.S. 306 [70 S.Ct. 652, 94 L.Ed. 865].) Indeed, in the context of an ex parte proceeding by which a prison physician sought permission to forcibly treat an inmate, the California Supreme Court has indicated its disapproval of "any procedure that denies or limits any relevant party access to the proceedings and the opportunity to be heard," except "in cases of imminent danger to the life or health of the patient or a similar exigency." (*Thor v. Superior Court* (1993) 5 Cal.4th 725, 733, fn. 2 [21 Cal.Rptr.2d 357, 855 P.2d 375].) "The unnecessary exclusion of *the* critical party from meaningful participation in a determination of this right to direct the course of medical treatment contravenes the basic tenets of our judicial system and affronts the principles of individual integrity that sustain it." (*Ibid.*)

---

[5]Respondent suggested at oral argument that the present action is an inappropriate vehicle for the relief appellant seeks, because appellant did not challenge the trial court's granting of the notice waiver in the conservatorship case. She offered no authority for this point. Although respondent noted in the statement of facts in her brief on appeal that appellant had not sought appellate review of the trial court orders waiving notice or establishing the conservatorship, respondent did not argue that this fact precluded appellant from maintaining the present petition. A writ of mandate may be issued to a petitioner who is "beneficially interested"—that is, who "has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large" (*Carsten v. Psychology Examining Com.* (1979) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276])—or to any citizen " ' "where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty . . . ." ' " (*Green v. Obledo* (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256].) Respondent has not asserted that appellant lacks standing to maintain the action under these tests.

*People v. Ramirez* (1979) 25 Cal.3d 260, 268 [158 Cal.Rptr. 316, 599 P.2d 622] (*Ramirez*), established the test that has since been utilized by courts to evaluate due process claims under the California Constitution. "[T]he due process safeguards required for protection of an individual's statutory interest must be analyzed in the context of the principle that freedom from arbitrary adjudicative procedures is a substantive element of one's liberty. (See Van Alstyne, *Cracks in "The New Property"*[*: Adjudicative Due Process in the Administrative State* (1977)] 62 Cornell L.Rev. [445,] 487.) This approach presumes that when an individual is subjected to deprivatory governmental action, he always has a due process liberty interest both in fair and unprejudiced decision-making and in being treated with respect and dignity. Accordingly, it places front and center the issue of critical concern, i.e., what procedural protections are warranted in light of governmental and private interests. [¶] In determining applicable due process safeguards, it must be remembered that 'due process is flexible and calls for such procedural protections as the particular situation demands.' (*Morrissey* v. *Brewer* (1972) . . . 408 U.S. [471,] 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484].) . . . [¶] . . . . More specifically, identification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. (See *Civil Service Assn.* v. *City and County of San Francisco* (1978) 22 Cal.3d 552, 561 [150 Cal.Rptr. 129, 586 P.2d 162].)" (*Ramirez, supra*, 25 Cal.3d at pp. 268-269.)

▮ One private interest plainly affected by appointment of a conservator is the conservatee's right to liberty. It is the constitutional right to liberty that prohibits a state from confining to an institution an individual who is capable of surviving safely in freedom, either alone or with the assistance of family and friends. (*O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 575 [95 S.Ct. 2486, 2493-2494, 45 L.Ed.2d 396].) "Confinement in a mental institution deprives an individual of his fundamental right to liberty. From the perspective of the person who resists this confinement, there is little to distinguish it from incarceration in a penal institution. The involuntarily committed individual does not view his detention as a kindly act of the State which will inure to his benefit." (*Doe* v. *Gallinot* (C.D.Cal. 1979) 486 F.Supp. 983, 991-992, affd. (9th Cir. 1981) 657 F.2d 1017.) "As the United States Supreme Court has authoritatively written, 'commitment is a deprivation of

liberty. It is incarceration against one's will, whether it is called "criminal" or "civil." ' (*In re Gault* (1967) 387 U.S. 1, 50 [18 L.Ed.2d 527, 558, 87 S.Ct. 1428].) In a subsequent opinion, the Supreme Court reiterated that 'civil labels and good intentions do not themselves obviate the need for criminal due process safeguards . . . .' (*In re Winship* (1970) 397 U.S. 358, 365-366 [25 L.Ed.2d 368, 376, 90 S.Ct. 1068].)" (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 225 [152 Cal.Rptr. 425, 590 P.2d 1].)

"The proposed establishment of a conservatorship under the grave disability provisions of the LPS Act threatens a massive curtailment of liberty. The gravely disabled person for whom a conservatorship has been established faces the loss of freedom from physical restraint as well as potential disabilities ranging from loss of control of the payment and collection of debts, loss of control of proxy voting of shares of corporate stock, to loss of control over the institution, maintenance and defense of all actions and proceedings. (*Conservatorship of Roulet*[, *supra*,] 23 Cal.3d 219, 227. . . .) [¶] The gravely disabled conservatee also faces possible loss of rights such as the right to remain licensed to practice a profession, the right to continue to hold certain public offices, the right to marry, the right to refuse certain types of medical treatment, the right to remain registered to vote and the right to contract. (*Conservatorship of Roulet, supra,* 23 Cal.3d 219, 228.) [¶] In addition, a conservatee suffers from the stigma and loss of reputation inherent in being found to be gravely disabled as a result of a mental disorder. (*Conservatorship of Roulet, supra,* 23 Cal.3d 219, 228-229.) [¶] These significant liberty interests invoke strict application of the protective umbrella of the statutory procedures to all proposed conservatees under the gravely disabled provisions of the LPS Act." (*Conservatorship of Ivey* (1986) 186 Cal.App.3d 1559, 1565-1566 [231 Cal.Rptr. 376].) A temporary conservator may be granted powers as broad as those of a conservator. (§ 5353.)

Respondent maintains the liberty interest impacted by appointment of a temporary conservator without notice is limited because the duration of the conservatorship is only 30 days and the conservatee has several means to challenge the conservatorship. Clearly, a temporary conservatorship threatens a lesser loss of liberty than a permanent (one-year) conservatorship. Equally clearly, however, 30 days remains a significant amount of time to be confined against one's will.

As for the means to challenge the establishment of the conservatorship, respondent argues that at most the impact of Probate Code section 2250 would be to delay a hearing on the conservatorship by two days. Respondent reasons that all temporary conservatees, under the LPS, have a right to contest the conservatorship by filing a petition for writ of habeas corpus,

after which a hearing must be held within two days. (§§ 5353, 5275, 5276.) This argument, however, assumes that the conservatee receives notice of the conservatorship at the time it is established, and that the notice properly informs the conservatee of the right to judicial review. In the present case, appellant did not receive notice of the conservatorship until some time after May 18, more than three days after establishment of the conservatorship and expiration of the maximum time he could otherwise have been detained. Moreover, the evidence suggests that the notice appellant received did not inform him of his right to seek judicial review. According to the parties' stipulated facts, appellant was served by mail on May 18, 2000, "with a copy of the May 15, 2000 order appointing a temporary conservator, the May 17, 2000 order appointing an attorney, the letters of temporary conservatorship, and the May 12, 2000 conservatorship petition." None of these documents include any notice to the conservatee about means to challenge the conservatorship. Obviously, if the conservatee is not informed of his or her right to contest the conservatorship, the right to do so is illusory.

■ "The primary purpose of procedural due process is to provide affected parties with the right to be heard at a meaningful time and in a meaningful manner. Consequently, due process is a flexible concept, as the characteristic of elasticity is required in order to tailor the process to the particular need. (*People v. Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694]; *Rodriguez v. Department of Real Estate* [(1986)] 51 Cal.App.4th [1289,] 1296-1297 [59 Cal.Rptr.2d 65]; *In re Conservatorship of Moore[, supra,]* 185 Cal.App.3d 718, 728 . . . .) Thus, not every situation requires a formal hearing accompanied by the full rights of confrontation and cross-examination. (*Saleeby v. State Bar* [(1985)] 39 Cal.3d [547,] 565 [216 Cal.Rptr. 367, 702 P.2d 525].) 'What due process does require is notice reasonably calculated to apprise interested parties of the pendency of the action affecting their property interest and an opportunity to present their objections. . . .' (*Bergeron v. Department of Health Services* (1999) 71 Cal.App.4th 17, 24 [83 Cal.Rptr.2d 481].)" (*Ryan v. California Interscholastic Federation—San Diego Section* (2002) 94 Cal.App.4th 1048, 1072 [114 Cal.Rptr.2d 798]; *Conservatorship of Moore, supra,* 185 Cal.App.3d at pp. 725-726.) "If, as is often said, the opportunity to be heard is the fundamental requisite of constitutional due process (see, e.g., *Grannis v. Ordean* (1914) 234 U.S. 385, 394 [58 L.Ed. 1363, 1368-1369, 34 S.Ct. 779]), this right can only be given meaning and vitality by the parallel requirement that a person be adequately informed of the imminent governmental action. . . . The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for the interested to make their appearance . . . . [¶] . . . The means employed must be such as one desirous of actually informing the absentee

might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . . .' " (*Conservatorship of Moore, supra,* 185 Cal.App.3d 718, 725-726, quoting *Mullane v. Central Hanover Bank Tr. Co., supra,* 339 U.S at pp. 314-315 [70 S.Ct. at p. 657].)

Also at stake in the appointment of a temporary conservator is the conservatee's autonomy interest in decision making affecting his or her medical treatment. Under the LPS, psychiatric patients may not be presumed incompetent solely on the basis of their hospitalization. (§§ 5331,[6] 5326.5, subd. (d)[7]; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1315 [271 Cal.Rptr. 199].) ■ "[T]he right of persons not adjudicated incompetent to give or withhold consent to medical treatment is protected by the common law of this state [citations] and by the constitutional right to privacy. [Citations.]" (*Riese v. St. Mary's Hospital & Medical Center, supra,* 209 Cal.App.3d at p. 1317; *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 530 [110 Cal.Rptr.2d 412, 28 P.3d 151].) With respect to a physician's duty to disclose to a patient the risks inherent in proceeding with or declining a recommended treatment, and the probability of a successful outcome, the California Supreme Court has stated: "The weighing of these risks against the individual subjective fears and hopes of the patient is not an expert skill. Such evaluation and decision is a nonmedical judgment reserved to the patient alone. A patient should be denied the opportunity to weigh the risks only where it is evident he cannot evaluate the data, as for example, where there is an emergency or the patient is a child or incompetent. For this reason the law provides that in an emergency consent is implied [citations], and if the patient is a minor or incompetent, the authority to consent is transferred to the patient's legal guardian or closest available relative [citations]. In all cases other than the foregoing, the decision whether or not to undertake treatment is vested in the party most directly affected: the patient." (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 243-244 [104 Cal.Rptr. 505, 502 P.2d 1].) "Unless the incompetence of a person refusing drug treatment has been judicially established, 'it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure that the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires.' (*Rivers* v. *Katz* [(1986) 67 N.Y.2d 485] [504 N.Y.S.2d

---

[6]Section 5331 provides in pertinent part: "No person may be presumed to be incompetent because he or she has been evaluated or treated for mental disorder or chronic alcoholism, regardless of whether such evaluation or treatment was voluntarily or involuntarily received."

[7]Section 5326.5, subdivision (d), referring to informed consent, provides: "A person confined shall not be deemed incapable of refusal solely by virtue of being diagnosed as a mentally ill, disordered, abnormal, or mentally defective person."

74, 495 N.E.2d 337, 341].) The Legislature has made it eminently clear that this right does not disappear upon involuntary commitment." (*Riese v. St. Mary's Hospital & Medical Center, supra,* 209 Cal.App.3d at p. 1324.)

Respondent argues that no personal autonomy interest is affected by the decision to appoint a temporary conservator because a conservatee does not necessarily lose the right to consent to or refuse medical treatment. A conservatee retains the right to refuse or consent to treatment related specifically to his or her being gravely disabled, and to routine medical treatment, unless the court specifically orders to the contrary. (§ 5357; Prob. Code, §§ 2252, 2354, 2355.) A conservatee specifically has the right to refuse treatment with antipsychotic medication or convulsive treatment unless judicially determined to lack capacity to refuse treatment (§§ 5325.2, 5327, 5332-5336, 5325, subd. (f), 5326.7, subd. (f).)[8] Psychosurgery cannot be performed on any patient without informed consent. (§ 5326.6.)[9]

Respondent's argument, however, overlooks the fact that the decision to commit the conservatee to a facility for treatment is itself a decision affecting medical treatment. Probate Code section 4617, subdivision (a), a part of the Health Care Decisions Law (Prob. Code, § 4600 et seq.), defines "health care decision" as "a decision made by a patient or the patient's agent, conservator, or surrogate, regarding the patient's health care, including . . . [¶] [s]election and discharge of health care providers and institutions."[10] Since a temporary conservator has the power to require the conservatee, if necessary, to be "detained in a facility providing intensive treatment or in a facility specified in Section 5358 pending the determination of conservatorship[,]" the appointment of a temporary conservator affects the conservatee's interest in personal autonomy as well as in liberty.

[8]Section 5325.2, which gives involuntarily detained patients the right to refuse treatment with antipsychotic medication, expressly applies to persons detained under section 5150, 5250, 5260 or 5270.15 and does not refer to conservatees. Section 5327, however, provides that "[e]very person involuntarily detained under provisions of this part or under certification for intensive treatment or postcertification treatment in any public or private mental institution or hospital, including a conservatee placed in any medical, psychiatric or nursing facility, shall be entitled to all rights set forth in this part and shall retain all rights not specifically denied him under this part." Section 5326.7, concerning convulsive treatment, specifically applies to all involuntary patients, "including anyone under guardianship or conservatorship."

[9]In the present case, the conservatorship petition specifically requested that disabilities be imposed upon the conservatee, including that the conservatee be denied the right to refuse or consent to treatment specifically related to the conservatee's grave disability. The "Letters of Temporary Conservatorship," however, do not enumerate any specific powers granted to the conservator or restrictions imposed upon the conservatee.

[10]The Health Care Decisions Law expressly "does not authorize consent to . . . [¶] [c]ommitment to or placement in a mental health treatment facility." (Prob. Code, § 4652, subd. (a).)

The value of the personal autonomy interest is significant. Where a conservatee has been adjudicated to lack capacity to make health care decisions, the conservator must make such decisions "in accordance with the conservatee's individual health care instructions, if any, and other wishes to the extent known to the conservator." (Prob. Code, § 2355.) "The only apparent purpose of requiring conservators to make decisions in accordance with the conservatee's wishes, when those wishes are known, is to enforce the fundamental principle of personal autonomy." (*Conservatorship of Wendland, supra,* 26 Cal.4th 519, 545.)

The second *Ramirez* factor is the risk of an erroneous deprivation of the affected interest through existing procedures and probable value of additional procedural safeguards. When a temporary conservatorship is established without notice to the proposed conservatee, the court will often be acting on less than complete information, as the proposed conservatee is given no opportunity to present his or her side of the story. As the Supreme Court explained in the context of invalidating the ex parte issuance of a temporary restraining order affecting free speech interests: "Two basic defects are typical of ex parte proceedings. The first is a shortage of factual and legal contentions. Not only are facts and law from the defendant lacking, but the moving party's own presentation is often abbreviated because no challenge from the defendant is anticipated at this point in the proceeding. The deficiency is frequently crucial, as reasonably adequate factual and legal contentions from diverse perspectives can be essential to the court's initial decision on whether or not the circumstances warrant a temporary restraining order." (*United Farm Workers of America v. Superior Court* (1975) 14 Cal.3d 902, 908 [122 Cal.Rptr. 877, 537 P.2d 1237].)

The trial court's decision whether to grant a petition to appoint a conservator obviously turns on the court's assessment of the proposed conservatee's mental health. "The risk of error in all mental health decisions is substantial. Even when a standard requires a specific finding of dangerousness, there is great risk of error. There are no formulas, no 'elements of the offense.' Determinations necessarily require subjective judgments. As Chief Justice Burger wrote in his concurring opinion in *O'Connor v. Donaldson, supra,* '[t]here can be little responsible debate regarding "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." ' 422 U.S. at 584, . . . ." (*Doe v. Gallinot, supra,* 486 F.Supp. at p. 992.) In finding a unanimous verdict required in a jury trial to establish a conservatorship, the court in *Conservatorship of Roulet, supra,* 23 Cal.3d at page 230, stated: "The need for unanimous jury verdicts is all the more apparent when one considers the uncertainties that still surround psychiatric diagnoses. This court has recently noted that 'the divergence of expert views . . . render[s]

the possibility of mistake significantly greater [in the diagnosis of mental illness] than in diagnosis of physical illness.' (*In re Roger S.* [(1977)] 19 Cal.3d 921, 929 [141 Cal.Rptr. 298, 569 P.2d 1286].)" " ' "[B]ecause of the imprecision of the criteria and difficulty inherent in any attempt to compass the human mind" [citations] determinations of mental competence simply cannot achieve scientific certainty. . . .' " (*In re Locks* (2000) 79 Cal.App.4th 890, 894 [94 Cal.Rptr.2d 495], quoting *Riese v. St. Mary's Hospital & Medical Center, supra,* 209 Cal.App.3d at p. 1324.) Given the inherent risk of error in mental health determinations, the risk of proceeding ex parte is substantial. In fact, the Legislature has explicitly recognized that temporary conservatorships are not always sought for proper purposes: In adopting the statutes providing for an additional period of involuntary intensive treatment following the section 5250 14-day period, the Legislature stated: "It is the intent of the Legislature to reduce the number of gravely disabled persons for whom conservatorship petitions are filed and who are placed under the extensive powers and authority of a temporary conservator simply to obtain an additional period of treatment without the belief that a conservator is actually needed and without the intention of proceeding to trial on the conservatorship petition. This change will substantially reduce the number of conservatorship petitions filed and temporary conservatorships granted under this part which do not result in either a trial or a conservatorship." (§ 5270.10.)

Respondent maintains that the risk of erroneous deprivation resulting from modification of the five-day notice requirement of Probate Code section 2250 is minimal because the conservatorship petition is decided by an independent and neutral decision maker, the proposed conservatee has already been the subject of a hearing on the need for continued detention under section 5250, and the conservatee has the opportunity for immediate review of the court's decision.

We have no quarrel with respondent's assertion that the superior court is a neutral and objective decision maker, or that even in an ex parte proceeding the court has the power to deny the petition. As described above, however, the problem with the ex parte hearing is that the court is not given the benefit of evidence from the conservatee that might cast doubt on that presented by the petitioner. (Cf. *United Farm Workers of America v. Superior Court, supra,* 14 Cal.3d at p. 908.) Even an impartial decision maker is more apt to err when presented with only partial information upon which to base the decision.

The instant case illustrates the problem. The petition for appointment of a conservator for appellant stated that the "proposed conservatee is not presently receiving treatment for grave disability and is in need of involuntary

treatment before a hearing can be calendared and heard for the appointment of a permanent conservator." The petition sought waiver of the five-day notice requirement "because it is necessary that the proposed conservatee continue to receive treatment." May 12, 2000, the date the petition was executed, was the final day of appellant's 14-day commitment; the recommendation for appointment of a conservator operated to extend this period until May 15. (§ 5352.3.) The recommendation, which had been written on May 10, stated that appellant was cooperating with oral medications but refused to take one specific medication upon which he reportedly did best in the community. Thus, the representation in the petition that appellant was not receiving treatment was not accurate: He *was* receiving treatment, albeit not the one the treating professionals deemed optimal. Since the recommendation for a conservatorship was prepared on May 10, and the petition prepared on May 12, there is no apparent reason appellant could not have been provided with *some* notice, though not the full five days generally required under Probate Code section 2250. The petition offers no specific explanation for its request to bypass all notice to appellant.

The fact that the proposed conservatee has been the subject of a probable cause hearing at the beginning of the 14-day commitment period (§§ 5254, 5256) does not eliminate, or even necessarily substantially reduce, the risk of error in the conservatorship decision. The purpose of the 14-day commitment is "intensive treatment." To assume that an individual remains gravely disabled at the end of the 14-day period because he or she was found to be gravely disabled at the beginning would be to assume the treatment period generally fails. Indeed, as we have seen, involuntary patients have a right to a second probable cause hearing if they are certified for an additional 30 days of intensive treatment following the 14-day period. (§§ 5270.15, 5256.)

As for respondent's argument that the risk of error in ex parte temporary conservatorship decisions is minimal because of the opportunity for immediate judicial review by writ of habeas corpus, as discussed above, the availability of "immediate" review is a farce if the conservatee is not informed of it. Even assuming the notice provided to the conservatee after establishment of the conservatorship provides information about the right to judicial review, if, as in appellant's case, the notice is not received until several days after the conservatorship is put in place, any judicial review would hardly be "immediate." According to Greta Jenkins, who had represented many proposed conservatees in Solano County, patients often did not wish to pursue a petition for writ of habeas corpus because, given the late receipt of notice of the temporary conservatorship and appointment of the public defender, by the time Jenkins could have filed such a petition the end of the 30-day temporary conservatorship period would be near.

Additionally, the availability of postappointment judicial review by petition for writ of habeas corpus does not substitute for an opportunity to challenge the appointment at the outset. In *Doe v. Gallinot, supra,* 486 F.Supp. 983, the district court held that the provision of the LPS which then allowed 14-day certification without an automatic probable cause hearing violated due process despite the availability of review by writ of habeas corpus. The court explained that the procedural safeguards of providing notice of the 14-day certification along with information about the right to file a petition for habeas corpus and to representation by counsel "do not assure that a person will not be certified without probable cause. The State's determination may still be unreviewed. Habeas corpus is difficult to understand. The individual may not request a hearing because of the influence of drugs or great emotional distress." (486 F.Supp. at pp. 992-993.) Affirming the district court, the Ninth Circuit agreed that the protection offered by habeas corpus procedures was "illusory when a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place." (*Doe v. Gallinot, supra,* 657 F.2d 1017, 1023.)

Respondent's additional points about existing safeguards are no more convincing. The fact that the conservatorship will be reviewed after 30 days does nothing to diminish the risk of an erroneous decision to appoint a temporary conservator with the attendant loss of liberty and autonomy for the conservatee. Rehearing by the trial court would serve little purpose, as a petition for rehearing need only be heard within 30 days (§§ 5364-5365), and the temporary conservatorship only lasts for 30 days. Appeal of the ex parte order, needless to say, would take far too long to offer any relief from an erroneous decision.

Prospective conservatees could benefit substantially from the procedural safeguard of personally served notice of a petition for appointment of a temporary conservator. As discussed above, notice and an opportunity to be heard is a fundamental component of due process. With notice that a conservatorship is being sought, the proposed conservatee would have an opportunity to contest the appointment either before it occurred or within a short time thereafter. Without such notice, as we have seen, the conservatee's only realistic option is to wait out the temporary conservatorship and attempt to secure his or her liberty at the conservatorship hearing. Moreover, even if the proposed conservatee could not avoid the conservatorship, he or she might be able to influence the scope of the powers given to the temporary conservator and restrictions imposed upon the conservatee. At a minimum, the proposed conservatee's dignity interest in being informed of, and allowed to participate in, decisions affecting him or her would be protected.

■ This dignity interest is the third factor to be considered under the *Ramirez* test. As *Ramirez* explained, there is an "important due process interest in recognizing the dignity and worth of the individual by treating him as an equal, fully participating and responsible member of society. [Citations.] 'For government to dispose of a person's significant interests without offering him a chance to be heard is to risk treating him as a nonperson, an object, rather than a respected, participating citizen.' [Citation.]" (*Ramirez, supra,* 25 Cal.3d at pp. 267-268.) Without notice to the person affected by governmental action, that action can be viewed as "arbitrary" and "unfair." (*Anderson v. Superior Court* (1989) 213 Cal.App.3d 1321, 1331 [262 Cal.Rptr. 405].) "[D]ue process affords a litigant a right to be heard, 'not only because he might contribute to accurate determinations, but also because a lack of personal participation causes alienation and a loss of that dignity and self-respect that society properly deems independently valuable.' (Mashaw, *The Supreme Court's Due Process Calculus for Administrative Adjudication in Mathews* v. *Eldridge: Three Factors in Search of a Theory of Value* (1976) 44 U. Chi. L.Rev. 28, 49-50.)" (*Dodds v. Commission on Judicial Performance* (1995) 12 Cal.4th 163, 176-177 [48 Cal.Rptr.2d 106, 906 P.2d 1260].) ■ The conservatee is the critical party affected by the decision to appoint a temporary conservatorship. "The unnecessary exclusion of *the* critical party from meaningful participation in a determination of his right to direct the course of medical treatment contravenes the basic tenets of our judicial system and affronts the principles of individual integrity that sustain it." (*Thor v. Superior Court, supra,* 5 Cal.4th 725, 733, fn. 2.)

Respondent argues that the proposed conservatee's dignity interest is limited for essentially the same reasons she maintained there was minimal risk of an erroneous decision under existing procedures: All temporary conservatees have a hearing on the conservatorship within 30 days, have had a hearing at the outset of the 14-day intensive treatment period, have a right to review by petition for writ of habeas corpus, and have a right to seek appellate review. As discussed above, none of these procedures eliminate the fact that a proposed conservatee who is not given notice of the petition for appointment of a temporary conservatorship is subjected to a 30-day period of involuntary commitment and other restrictions of liberty without a meaningful way to oppose, or seek limitations on, the appointment. Subjecting a person to such curtailment of liberty without so much as awareness that the proceedings are afoot until after they are completed, surely undermines the dignity interest of the individual affected.

Respondent also cites *Conservatorship of Moore, supra,* 185 Cal.App.3d 718, 730, which she describes as finding that an ex parte LPS hearing

"actually preserved a conservatee's dignity by avoiding a 'potentially uncomfortable and disruptive court appearance. . . .'" *Moore* upheld the constitutionality of "reestablishing a conservatorship ex parte when the conservatee chooses not to contest the proceeding." (*Id.* at p. 731.) In *Moore*, the conservatee received notice of the hearing on reestablishment of his conservatorship and his attorney represented to the court that the conservatee did not oppose reestablishment and did not seek a hearing. In upholding the constitutionality of the scheme that allowed the hearing to proceed ex parte, *Moore* noted that the procedures "allowed Moore to avoid a potentially uncomfortable and disruptive court appearance which, in light of his nonopposition to reestablishment, would have likely been brief and pro forma." (*Id.* at p. 730.) Clearly, there can be a dignity interest in choosing to avoid an unwanted court appearance. It does not follow, however, that precluding a hearing (or other input into the decision) serves a dignity interest. Moreover, nothing in *Moore* condones forgoing notice to the conservatee. To the contrary, *Moore* recognized notice as "'[a]n elementary and fundamental requirement of due process.'" (*Id.* at p. 725, quoting *Mullane v. Central Hanover Bank Tr. Co., supra,* 339 U.S. at p. 314 [70 S.Ct. at p. 657].)

The final *Ramirez* factor is "the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Ramirez, supra,* 25 Cal.3d at p. 269.) The parties characterize the governmental interest differently. To appellant, the governmental interest is in "enabling proposed temporary conservatees to obtain notice of the proposed appointment of a temporary conservator so that they do not lose fundamental rights of utmost importance to their autonomy." Appellant cites section 5270.10, which, as we have seen, expresses the Legislature's intent to "reduce the number of gravely disabled persons for whom conservatorship petitions are filed and who are placed under the extensive powers and authority of a temporary conservator simply to obtain an additional period of treatment without the belief that a conservator is actually needed and without the intention of proceeding to trial on the conservatorship petition."

To respondent, the governmental interest is to provide for the temporary care, maintenance and support of the conservatee, to protect his or her property, to facilitate treatment for the mentally ill, and to protect the public and the mental ill from criminal acts. "The state's interest in preventing individuals from harming themselves or others, which is based upon government's police and parens patriae powers, is a preeminent one." (*Donahue v. Rhode Island Dept. of Mental Health* (D.R.I. 1986) 632 F.Supp. 1456,

1465.)[11] Respondent cites Probate Code section 2252, which sets forth the powers of a temporary conservator to provide for the care, maintenance and support of the conservatee and protect his or her property, to make medical decisions under certain circumstances, and otherwise as ordered by the court, and section 5001, which states the legislative intent behind the LPS. Interestingly, respondent does not refer to all of the provisions of section 5001, notably the statement of legislative intent to "safeguard individual rights through judicial review." (§ 5001, subd. (d).)

Both parties are partially correct. Clearly, the statutory provisions for appointment of a temporary conservator reflect a governmental interest in protecting the conservatee and his or her property for an interim period, before a regular conservatorship can be established. Equally clearly, the provisions of the LPS generally reflect a legislative intent to "scrupulously protect[] the rights of involuntarily detained mentally disordered persons." (*Keyhea v. Rushen, supra,* 178 Cal.App.3d at p. 534.) Probate Code section 2250 calls for five days' notice of a petition for appointment of a temporary conservator unless the court finds "good cause" for modifying this requirement. This notice requirement was established by amendment of the statute in 1979 (Stats. 1979, ch. 726, § 3, p. 2334; the prior version of the statute allowed appointment of a temporary conservator "with or without notice as the court . . . may require." (Former Prob. Code, § 2201, as amended by Stats. 1978, ch. 1268, § 1, p. 4115.) This alteration of the notice requirement necessarily implies a greater concern with providing notice to a proposed conservatee. When applied to temporary conservatorships under the LPS, with its careful attention to the substantive and procedural rights of involuntary detainees, it can only be inferred that the Legislature intended proposed temporary conservatees to be given notice in most cases, unless true "good cause" exists for reducing or eliminating notice. Considering the notice provision in conjunction with the express legislative statement of intent that temporary conservatorships not be established unnecessarily (§ 5270.10), we agree with appellant that there is at stake a governmental interest in ensuring notice to proposed temporary conservatees where reasonably possible, which operates in conjunction with the governmental

---

[11]Respondent relies upon *Donahue v. Rhode Island Dept. of Mental Health, supra,* 632 F.Supp. 1456, which upheld a Rhode Island statute authorizing emergency detention, for up to 10 days, of individuals incapacitated by or dangerous because of alcohol consumption, although the statute did not provide for a precommitment hearing. Unlike the present case, *Donahue* dealt with an initial emergency commitment, not continued detention after some 17 days of intensive psychiatric treatment. *Donahue* stressed the role of notice: "Moreover, the detainee is not left in the dark with respect to the circumstances of the restraint. The statute provides: 'A copy of the written application for commitment and of the physician's certificate, and a written explanation of the person's right to counsel, shall be given to the person within twenty-four (24) hours after commitment by the administrator, who shall provide a reasonable opportunity for the person to consult counsel.' " (*Donahue,* at pp. 1466-1467.)

interest in protecting individuals by means of temporary conservatorships where necessary.

Not surprisingly, the parties differ considerably in their assessment of the burden of imposing the additional procedural safeguards appellant seeks. Appellant stresses that a requirement of providing advance notice in all cases except those presenting exigent circumstances would not entail substantial costs, only those associated with secretarial typing time, the cost of paper, serving process on an easily located individual, and filing of a declaration of service. As to those proposed conservatees who would request a hearing, appellant suggests there might actually be a reduction of costs, as these individuals might voluntarily accept treatment alternatives in lieu of more expensive treatment in the hospital setting. The record before us provides no basis for accepting or rejecting this latter proposition; whether proposed conservatees would be willing to accept treatment voluntarily if notified prior to establishment of a conservatorship is at this point a matter of speculation. It does seem self-evident, however, that allowing the proposed conservatee an opportunity to have input into the decision would assist the court in reaching the correct decision and could serve the governmental interest in reducing the number of unnecessary temporary conservatorships. (Cf. *In re Head, supra,* 147 Cal.App.3d 1125, 1133 [due process protections afforded to prisoners being considered for work furlough could result in net increase in those accepted to program, furthering governmental interest in reducing prison overcrowding and ensuring appropriate inmates selected for program].)

Respondent stresses the need for flexibility in petitioning for appointment of a temporary conservator, to allow for immediate protection and assistance to the conservatee. Flexibility is built into the existing statutory scheme, which requires notice except on a finding of good cause. Appellant's challenge, as discussed above, is not to the statute itself but to respondent's apparent practice of routinely seeking to dispense with notice altogether, without any meaningful and appropriate demonstration of good cause in an individual case. Respondent's argument is thus a red herring, as appellant does not claim that a full hearing should be required in every case before appointment of a temporary conservator.

Respondent presented considerable evidence of the burden that would be imposed in cases in which a hearing is required before appointment of a temporary conservator. This burden would include some four hours of additional work for respondent's office for each temporary conservatorship, time for the physicians or other mental health professionals testifying at each hearing, which would necessarily be time away from treating patients, and additional costs to pay for witnesses' time at hearings. Respondent and her witnesses additionally testified that a five-day notice and preappointment

hearing requirement would make it more likely that some people in need of conservatorships would not get them, because they would be released from the hospital before the temporary conservatorship could be established.

These burdens, however, are already inherent in the statutory scheme. The LPS does not presently provide for ex parte establishment of temporary conservatorships in all cases. Rather, it provides for notice in most cases, subject to an individualized determination of good cause for dispensing with notice. In making Probate Code section 2250 the statute governing notice to proposed temporary conservatees, the Legislature determined that notice was appropriate in the average case, a determination from which it follows that the Legislature anticipated that some proposed temporary conservatees would oppose the establishment of the conservatorship. Adhering to the notice requirement of Probate Code section 2250 would not necessarily entail a hearing in every case, or a preappointment hearing in any case: Patients certified for involuntary inpatient treatment under sections 5260 and 5270.10 do not have a right to a precertification review hearing, but to a hearing within four days of certification. The notice provisions of Probate Code section 2250 simply serve to inform the proposed conservatee of the action being contemplated and to allow the conservatee to challenge the conservatorship within a short time of its establishment by a request for judicial review.

Several additional points are worth noting. Unlike the situation with Probate Code conservatorships, the proposed temporary conservatees at issue in the present case are hospitalized and receiving treatment a short distance from respondent's office at the time the petition for appointment of a temporary conservator is filed. Thus, respondent is not faced with the spectre of having to serve a proposed conservatee whose location is unknown or difficult to determine. The evidence at trial indicated that, in general, the decision to recommend a conservatorship is made by the treating facility roughly midway through the 14-day certification period. When this is in fact the case, no reason appears why the statutory five-day notice could not be provided to the proposed conservatee. Even in the situation where a last minute recommendation is required, the fact that the recommendation triggers an additional three days of detention (§ 5352.3) means that *some* notice, albeit not five days, could be provided. In the present case, the recommendation for a conservatorship was made by the facility on May 10, two days before expiration of the 14-day certification period. Respondent's office prepared the petition for appointment of a temporary conservator on May 12 and the conservatorship was established on May 15. At a minimum, notice could have been provided to appellant at the time the petition was filed, which would have been several days before the court hearing.

Considering the proposed temporary conservatee's liberty, personal autonomy and dignitary interests in receiving notice and an opportunity to be

heard, the risk of erroneous decisionmaking in the ex parte context, the governmental interests in protecting individuals in need of conservatorships and in providing involuntary detainees with due process, the relatively small costs associated with providing notice in most cases, and the fact that the burdens associated with holding hearings in some cases, as requested, must have been contemplated by the Legislature, we conclude that a routine practice of seeking notice waivers in temporary conservatorships violates the proposed conservatees' right to due process. As has been stated, appellant does not seek to preclude respondent from seeking, or the trial court from granting, a notice waiver or modification in an appropriate case. To comply with Probate Code section 2250, however, such a waiver or modification must only be sought where there is "good cause," not as a matter of routine. In the context of the LPS, with its attention to the rights of mentally ill patients, it is difficult to view the "good cause" that would allow modification of the five-day notice requirement as anything short of exigent circumstances. (Cf. *Thor v. Superior Court, supra,* 5 Cal.4th at p. 733, fn. 2.) Certainly, "good cause" for shortening or dispensing with notice cannot be established without an individualized showing of why the statutorily prescribed notice can not be provided in a given case.

Respondent relies upon *Conservatorship of Gray* (1970) 12 Cal.App.3d 513 [90 Cal.Rptr. 776], which upheld the constitutionality of ex parte appointment of a temporary conservator, *Gray* stated: "The appointment of a temporary conservator after the filing of the petition for the appointment of a conservator is in the nature of a provisional remedy granted before a hearing on the merits of the primary petition. Its sole object is to preserve the health and welfare of the alleged conservatee and to preserve his estate from loss or dissipation during the period of time between the appointment of the temporary conservator and the hearing on the primary petition for the appointment of a conservator. Many instances could arise where the alleged conservatee is about to lose his property through deceit imposed upon him by artful or designing persons. To wait for the service of a citation upon him and for a hearing on the petition for the appointment of a conservator to take over the estate and prevent such loss could thwart the very objects and purposes of the conservatorship law. Under these circumstances to first require the service of a citation on the alleged conservatee and the conduct of a hearing on the petition before the appointment of a temporary conservator would amount to a useless act if the estate of the conservatee was lost in the meantime." (*Id.* at p. 524.)

*Gray* was followed in *O'Brien v. Dudenhoeffer* (1993) 16 Cal.App.4th 327 [19 Cal.Rptr.2d 826]: " '[T]he appointment of a temporary conservator pursuant to . . . the Probate Code, without notice, the effect of which is to

temporarily protect the person and to protect and preserve the estate of the alleged conservatee pending a hearing on the petition for the appointment of a [permanent] conservator, does not offend the concept of due process of law.'" (*Id.* at p. 335, quoting *Conservatorship of Gray*, *supra*, 12 Cal.App.3d at p. 524.)

These cases dealt with conservatorships established under the Probate Code. *Gray* construed former Probate Code section 2201, which then permitted the appointment of a temporary conservator "with or without notice," for "good cause." The court found no constitutional problem because the conservatorship was temporary and the appointment of a regular conservator would require notice and a hearing. *Gray* did not involve an LPS conservatorship or a person involuntarily committed to a psychiatric treatment facility. Similarly, *O'Brien* involved a Probate Code conservatorship and an issue of capacity to deed property, not an LPS conservatorship and issue of involuntary commitment. Moreover, as has been stated, appellant does not challenge the ex parte appointment of a temporary conservatorship in all circumstances, but only where the ex parte procedure is not justified by individualized good cause. Given the focus of *Gray* and *O'Brien* on protection of a conservatee's property rather than his or her liberty, and the relatively cursory treatment given their due process analysis, we do not consider them particularly pertinent to the issue in the case before us.

In sum, we conclude that respondent's practice of requesting notice waivers in all applications for temporary conservatorships violates the constitutional guarantee of due process. The presumption clearly stated in Probate Code section 2250 is for provision of five days' notice of a petition for a temporary conservatorship to an individual institutionalized under section 5150 or 5250. This presumption may be departed from only upon a showing of good cause, that is, an individualized showing of exigent circumstances in a particular case. A blanket statement of reasons offered as a matter of routine policy does not constitute good cause under Probate Code section 2250.

The judgment is reversed. The trial court is ordered to grant the petition for writ of mandate and request for declaratory relief in accordance with the views expressed herein.

Lambden, J., and Ruvolo, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 2, 2002.