Filed 8/31/20  Rampony v. Rizzon CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| NAUSICAA RAMPONY<br><br>Petitioner and Respondent,<br><br>v.<br><br>LAURENT RIZZO,<br><br>Defendant and Appellant. | B299147<br><br>(Los Angeles County Super. Ct. No. 19STRO02277) |

APPEAL from an order of the Superior Court of Los Angeles County, Alison Mackenzie, Judge. Affirmed.

Laurent Rizzo, in propria persona, for Defendant and Appellant.

No appearance for petitioner and respondent.

Appellant Laurent Rizzo and respondent Nausicaa Rampony were married in 2006. Rizzo's abuse of his wife began in 2010, when the couple and their children lived in France. Rizzo's abuse of the children began after the family moved to Los Angeles in December 2014, and persisted after he and Rampony separated in 2016.

Rampony commenced these proceedings on April 8, 2019 by filing a request for a domestic violence restraining order against Rizzo to protect herself, their then ten-year-old daughter, and their then nine-year-old son. Following a contested hearing, the trial court granted Rampony's request. Representing himself, Rizzo appealed. On appeal Rizzo contends the trial court abused its discretion in issuing the order and violated his due process rights. For the reasons discussed below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Rampony's Request for a Domestic Violence Restraining Order and Supporting Declaration

Rampony's declaration in support of her request for a domestic violence restraining order described at least four incidents of Rizzo's emotional, verbal and physical abuse toward her and their children: (1) On April 3, 2019, Rizzo kicked, punched and choked Rampony and threatened "to cut [her] body in[to] pieces and bury [her] for leaving him." Rizzo also slapped and hit the children's faces, arms and legs because he was angry at Rampony; (2) In 2015, Rizzo beat up Rampony in front of the children and their nanny;[1] (3) On November 4, 2018, Rizzo threw

---

[1] Rampony's declaration appears to give the date of this incident as either "April 2" 2019, or "since 2015." However, both

2

rocks at, shook, choked and punched Rampony. Rizzo also threatened to "chop [her] body into pieces and bury [her]" with an unidentified "weapon," if she did not allow him to take the children on "a non-visitation day." Rampony stated "[the kids] were witnesses to [Rizzo's] violence toward me and how he is directing his anger and violence toward them."; (4) Rampony referred to an occasion "last August" [2018] when Rizzo took their daughter "when it was not his day." Rampony further stated Rizzo had often threatened to abduct the children to France and that they were afraid of him.

Rampony's court filing requested a temporary restraining order and an order granting her sole legal and physical custody of their children with monitored visitation for Rizzo. Rampony additionally asked the trial court to restrict Rizzo from traveling with the children without a court order or her written permission because she feared he would abduct them to Mexico or France. The court partially granted Rampony's request by issuing a temporary restraining order against Rizzo, pending a hearing.

## B.    The Contested Hearing

The case proceeded to a three-day contested hearing with live testimony. Rampony and two witnesses testified on her behalf. Rizzo and six character witnesses testified on his behalf. The trial judge questioned the two children in the presence of the parents and counsel. The testimony of Rampony, Rizzo and the children focused primarily on the incidents of abuse that allegedly occurred on August 13, 2018, November 4, 2018, and April 2 and 3, 2019, when the family was living in Los Angeles.

-------

Rampony and the children's nanny confirmed at the hearing that the incident occurred in August 2015.

3

Rampony and the children also testified about a 2015 incident. Rampony and Rizzo testified about the first incident of purported abuse, which occurred in France in 2010.

### 1.    The 2010 incident in France

Rampony testified while the children were sleeping, Rizzo pushed her, choked her and grabbed her arms, causing bruising. Included in her declaration were two undated photographs of Rampony's left arm, showing the bruises she suffered in this incident. After her mother reported the incident to French authorities, Rizzo threatened to send "Romanian guys" to harm his mother-in-law if Rampony failed to convince her to drop the resulting criminal charge.

Rizzo testified he grabbed Rampony's arm during an argument in 2010, but he denied choking her or pushing her at the time. He also testified the incident did not result in any criminal charges or a restraining order in France. Rizzo acknowledged on cross-examination that his mother-in-law's report of the incident had led to a criminal charge of abuse in France and that he had signed an admission to having grabbed his wife's arm. He also testified the charge was later dismissed. In signing the document, Rizzo denied he had done "anything violent" to Rampony. When asked whether he still believed his denial, Rizzo stated his actions were "not appropriate."

### 2.    The 2015 incident in Los Angeles

Rampony testified when the family was living in Los Angeles in 2015, she and Rizzo argued over where the children should sleep. Rampony wanted them to sleep in the master bedroom, because it was larger. Rizzo disagreed and started

hitting Rampony and choking her. The children screamed, and made him stop. Their nanny was present, and she took the children outside until the parents stopped arguing.

The children's nanny at the time partially corroborated Rampony's account. She testified Rizzo became angry with Rampony and pushed her in the master bedroom/hallway area. The children screamed and cried.

The daughter testified her parents initially argued over who should help the son with his homework. Rizzo then choked Rampony, threw her against the wall and hit her, bruising her arm. The couple then went upstairs and argued about which bedroom the children would use. The children followed, and the daughter saw Rizzo pushing Rampony and screaming at her.

The son testified Rizzo was choking and hitting Rampony and his nanny was present. He was not asked to provide the date or circumstances of this incident.

Rizzo was not asked about the 2015 incident when he testified after Rampony had related it on direct examination.

### 3. The 2018 incidents in Los Angeles
#### a. The August 13, 2018 incident

Rampony testified on August 13, 2018, when she was supposed to have the children, Rizzo picked up the daughter from school without her knowledge. Rampony panicked and contacted Rizzo, who acknowledged he had taken their daughter to his home. After Rampony and their son entered the house to retrieve the daughter, Rizzo locked them inside and would not let them leave. While the son talked to Rizzo in another room, Rampony gave the daughter the car key. The daughter left, followed by Rampony and the son.

The daughter testified that in August 2018, Rizzo picked her up from school when it was not his day to have her. Rampony arrived at the home after looking for the daughter and said they were leaving. Rizzo "went in front of the door, and just said, 'Nobodies [sic] getting out of this house.'" The daughter testified, "[I]t was really scary. I was scared." After Rizzo pushed Rampony, the son pulled his father into the bedroom to talk. The daughter testified, "[A]nd then my dad said . . . , 'I'm going to destroy you,' to my mom." Rampony told the children to go to the car, and the three of them left.

The son testified, when it was "not [Rizzo's] day," he "was talking to [his] dad so he [would] listen but not enough. It was still happening."

Rizzo's account of the August 13, 2018 incident was similar to Rampony's, except he testified it was his day to pick up his daughter from school. Rizzo also denied refusing to allow his wife and children to leave his house. When asked on cross-examination if he said "anything like that to everyone present that they cannot leave?" Rizzo answered, "Not really."

### b.     The November 4, 2018 incident

Rampony testified that on the night of November 3, 2018, she and her children came home late from a soccer match. She texted Rizzo asking him to pick up the children at 10:00 a.m. the following morning rather than the usual 9:00 a.m. so they could sleep an hour later. Between 8:45 a.m. and 9:00 a.m., Rizzo arrived at her home, banged on the windows, screamed insults at Rampony and demanded the children come outside.

The daughter testified that Rizzo came to Rampony's home in the morning and started banging on the windows and throwing

rocks. She further testified Rizzo said, "Come on. Let's go. We have ice skating."

Rizzo denied Rampony's account and testified he never left his car. Rizzo communicated with his wife solely by text messages that morning until the children came outside and got into his car. He denied throwing rocks at or banging on Rampony's windows. He acknowledged he had sent the "okay" emoji, but claimed it was an "ironic" response to Rampony's texts complaining of such conduct.

### 4.    The April 2-3, 2019 incidents in Los Angeles

Rampony testified what prompted her to institute these proceedings was a phone call from her daughter on or about April 3, 2019. The daughter claimed Rizzo was planning to take them to France and to never return to California.[2] Her son also called her for the same reason. Rampony testified Rizzo frequently asserted he was going to abduct the children and take them to Mexico or France, although she possessed their passports. Rampony testified Rizzo also told her that he wanted to go to France. Shortly before she testified at the hearing, Rizzo handed Rampony two airline tickets for the children. He never consulted with her before purchasing these tickets.

The daughter testified that, at the end of March 2019, Rizzo told her they "were going to France." The daughter further testified she "didn't want to. [She] wanted to stay with [her]

---

2    The court also admitted into evidence for the nonhearsay purpose of showing Rampony's state of mind, Rampony's testimony that the daughter reported Rizzo had beaten her "as hard as he could." Rampony testified this alleged incident also prompted her to seek the domestic violence restraining order.

mom." Rizzo told her that "health is more important." The next morning, the daughter went to school, telephoned Rampony from the school office and told her they were going to France.

Rizzo testified he told the children on April 1, 2019 that he would be returning to France. His son began to cry, but Rizzo assured him, "we are going to find a way with mommy together for you and [your sister]" and explained he had found an incredible school in France for his son.[3] The next day Rizzo told Rampony that his visa was expiring and he intended to return to France, so they had to discuss custody of the children. Rizzo also told Rampony he had filed for divorce in January, and they had been summoned to France where she would be served. The couple argued at length on the phone over physical custody of the children. Rizzo denied that he had ever threatened to abduct the children to France or Mexico.

Rizzo acknowledged the children's airline tickets he had shown Rampony during the hearing were for a round trip beginning and ending in Paris, France. Rizzo explained the airline had made a mistake, which he had since corrected. Rizzo denied telling the children they were going to live in France permanently. He and the children had previously traveled to France on vacation at least five times, and he had arranged the trips in advance with Rampony.

### 5. P. Groy's testimony

P. Groy testified on behalf of Rampony. He lived in Andora and had been friends with Rampony since 2002 and with Rizzo since 2005. Groy's relationship with the couple was "very good," however, he "stopped being friends with Rizzo" as the result of

---

[3] Both parents testified their son had a learning disability.

8

some earlier conversations in France. In 2011, Groy and the couple were having dinner alone. While discussing someone who still owed Groy money, Rizzo said, if faced with such a situation, he would kill the debtor and the debtor's wife and children. Groy expressed shock at the violence of Rizzo's statement. Rizzo "calmly" said he would kill his own wife should she cause him problems.

In 2014, Groy heard the couple was having marital problems. He called Rampony, who "spoke to [him] normally." Groy then telephoned Rizzo, who began a 15 to 20 minute tirade against his wife. The call ended with Rizzo's threat "to kill her, cut her into pieces and throw the pieces into the woods," if she "create[d] more problems." Groy attempted to call back and left Rizzo messages, but Rizzo never returned his calls. At some point, Groy related his conversation with Rizzo to Rampony. Since moving to Los Angeles, Rampony has telephoned Groy to discuss her problems with Rizzo.

### 6. The testimony of Rizzo's six character witnesses

Thibaut Foulquier, Linda Askew-Woodruff, Arnaud Duyoner, Michele LaPorta, and Jean Marc Galvez were Rizzo's friends and/or business acquaintances. They testified as character witnesses on his behalf. All of them had seen Rizzo interact with his children and considered him to be a loving father, who was involved in his children's activities. None of them saw Rizzo behave inappropriately toward the children. Also, the children's piano teacher testified the children behaved normally during their weekly lesson on April 3, 2019. He further testified

the children did not exhibit any unusual behavior toward their father nor did they appear harmed in any way.

### 7. Other relevant testimony

Rampony testified she would become frightened when Rizzo was angry and always feared he would become angry. Rampony never before reported Rizzo's abuse and minimized it, because she wanted to keep her children happy and avoid making Rizzo angry. Whenever she had the children, Rizzo constantly telephoned until she answered, and ignored her requests that he stop. He would also show up at school unexpectedly when it was her turn to have the children. Rampony testified she believed her daughter's claims that Rizzo had beat her on one occasion.

The daughter testified Rizzo was impatient with the son's progress on his homework, so the son would go to his room. Rizzo would then grab the son by the arm, shake him and begin yelling. The daughter also testified that Rizzo had hit them in the car when she and the son were fighting in the backseat. She also testified their father hit them at a friend's home on Christmas day 2018 in front of other people.

The son testified Rizzo would hit, scream, shake, yell and say the son was "stupid" "every time" the son "did something wrong."

Rizzo denied all allegations of abuse of Rampony in Los Angeles. He was not questioned about the alleged abuse of the children.

## C. The Trial Court's Findings and Order

After listening to counsels' arguments, the trial judge summarized the evidence at length and concluded Rampony had

proved by a preponderance of the evidence that Rizzo "had engaged in acts of abuse as defined in Family Code section[s] 6203 and 6320. Those acts of abuse include[d] [Rizzo] intentionally causing bodily injury to [Rampony], threatening [her], attacking [her] and disturbing [her] emotional and mental calm by exercising coercive control over her." The judge specifically found true Rampony's testimony concerning the 2010 incident in France, Groy's account of Rizzo's threats to harm Rampony, the nanny's and daughter's testimony about the August 13, 2016 incident, the daughter's testimony about Rizzo's abuse of the son and the testimony of Rampony and the children about the August and November 2018 incidents. Overall, the judge found credible Rampony's testimony that she and Rizzo "ha[d] a complicated, troubled, abusive relationship that consisted of [Rizzo] controlling [her] over a period of years with threats [and] periodic violence." The judge found while Rizzo reportedly loved his children very much, the nature of his controlling behavior and abuse would not necessarily be evident to his friends. The judge concluded, "So, based on the totality of the evidence, I find that [Rampony] feared for her safety as she stated many times, and that [Rizzo's] conduct will continue without a restraining order. I also [find] the fact that the kid[s'] testimony about their father's being physically abusive to them is another reason for them to be protected parties under the case law [and] that [Rampony's] emotional calm is also disturbed by those actions by [Rizzo]." The court then entered a three-year restraining order against Rizzo, awarded Rampony sole legal and physical custody of their children, and granted monitored visitation to Rizzo.

Representing himself, Rizzo timely filed a notice of appeal.

11

## DISCUSSION

In his opening brief and oral argument, Rizzo contends that Rampony lied, the nanny did not understand English, P. Groy lied, and the children's testimony was coached. We view these assertions collectively as a challenge to the sufficiency of the evidence in support of the findings. Rizzo also contends the trial court denied him procedural due process on various grounds. He requests a new hearing before a different trial judge.

At the outset, we note Rizzo failed to support his claims by a proper statement of facts in his brief with appropriate citations to the record and reasoned argument with citations to authority. (See Cal. Rules of Court, rule 8.204(a)(1)(B).) Because a trial court's decision is presumed correct, error is not presumed. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) It is the appellant's burden to convince us otherwise. (*Id.* at p. 566.) In any event, for reasons discussed below, we are not persuaded by Rizzo's claims.

### A. The Trial Court Did Not Abuse Its Discretion in Granting the Domestic Violence Restraining Order

#### 1. Governing law and standard of review

Under the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200, et seq[4]), a trial court may issue a restraining order to prevent domestic violence or abuse if the party seeking the order "shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300; see § 6220.) "Abuse" includes "intentionally or recklessly caus[ing] or attempt[ing] to cause

---

[4] All statutory references are to the Family Code.

12

bodily injury" to, "attacking, striking, stalking, threatening, harassing," "making annoying telephone calls" to, "or disturbing the peace of the other party." (§§ 6203, 6320.)

"A grant or denial of injunctive relief is generally reviewed for abuse of discretion. [Citation.] This standard applies to a grant or denial of a protective order under the DVPA. [Citation.]" (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420; accord, *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249,1264.) We review the trial court's factual findings for substantial evidence. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1505.) We "''accept as true all evidence . . . tending to establish the correctness of the trial court's findings . . . , resolving every conflict in the evidence in favor of the judgment.'" [Citation.]" (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.) "The pertinent inquiry . . . is whether substantial evidence [evidence that is reasonable, credible, and of solid value] supports the court's findings, not whether a contrary finding might have been made." (*In re Alexandria P.* (2016) 1 Cal.App.5th 331, 355.)

Although Rampony did not file a respondent's brief, that does not affect Rizzo's burden to show the trial court abused its discretion in issuing the domestic violence restraining order. (*Burquet v. Brumbaugh, supra,* 223 Cal.App.4th at p. 1141, fn. 1.)

### 2. Substantial evidence supports the findings

Here, the trial court did not abuse its discretion. Substantial evidence supports the court's finding that Rizzo abused Rampony within the meaning of Family Code sections 6320 and 6023. According to the testimony of Rampony, the children, and the nanny (all of which the trial court credited), Rizzo grabbed, hit, and choked Rampony on more than one

13

occasion. He also subjected her to emotional abuse through intimidation and threats, including that he would harm Rampony if she caused problems and would abduct the children to France or Mexico. As the court found, Rampony lived in constant fear of Rizzo's "pattern of [exercising] coercive control" over her. Rizzo's abuse extended to his children, particularly his son, whom he bullied, grabbed, and shook.

Rizzo focuses on inconsistencies in Rampony's courtroom testimony and conflicts between her testimony and her declaration, the nanny's English-language testimony, Groy's credibility, and assertions the children's testimony was "coached." We are precluded from second-guessing the trial court's credibility determinations, however. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 ["'questions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses . . . and the determination of [any] conflicts and inconsistencies in their testimony are matters for the trial court to resolve.' [Citation.]"]; *Beck Development Co. v. Southern Pacific Transportation Co.* (1966) 44 Cal.App.4th 1160, 1204 ["testimony of a witness offered in support of a judgment may not be rejected on appeal unless it is physically impossible or inherently improbable and such inherent improbability plainly appears. [Citation.]"].)

Notably, the court expressly found no evidence the children's testimony had been coached. The daughter testified Rampony did not tell the children "to say something in particular[.]" The son testified he had not spoken to his sister about appearing in court and Rampony just told him "it would be alright." The court acknowledged "minor inconsistencies" in the

14

nanny's testimony concerning the location of Rizzo's abuse of Rampony "potentially were due to language barriers" or the fact the incident had occurred three years earlier.[5] The court expressly found Groy's testimony credible. Nothing about the testimony of Rampony and her witnesses was physically impossible or inherently improbable. The trial court did not abuse it discretion in granting the domestic violence restraining order because substantial evidence supports its findings.

## B. The Trial Court Did Not Violate Rizzo's Due Process Rights

"'The primary purpose of procedural due process is to provide affected parties with the right to be heard at a meaningful time and in a meaningful manner.'" (*Edward W. v. Lamkins* (2002) 99 Cal.App.4th 516, 532; see also *Anderson Nat'l Bank v. Luckett* (1944) 321 U.S. 233, 246.) In claiming his due process rights were violated, Rizzo contends the judge "rushed" through the two-day hearing and unfairly denied him a third day, which would have given him the opportunity to rebut all of Rampony's allegations. Rizzo maintains he was surprised by some of her allegations, although he does not specify which ones, because they purportedly did not appear in her application for a domestic violence restraining order. Rizzo also argues he was denied the right to present a defense by having an additional 15 witnesses from France testify on his behalf.

After examining the record, we conclude Rizzo received the process that was due. It is true, for the same reasons Rizzo urges

---

5     The nanny first requested a Spanish language interpreter, but then told the court she would testify in English. She proceeded to testify without an interpreter.

on appeal, his counsel twice asked the judge to extend the two-day hearing, which was held May 6 and 7, 2019. The record shows the judge granted a continuance to May 22, 2019 for a third day of testimony. Thus, after Rizzo had heard the testimony of all witnesses on Rampony's behalf, he had 14 days until the hearing was to resume. Neither Rizzo's counsel nor Rizzo sought to have new witnesses examined on May 22, 2019. Nor did either request a continuance beyond that date. Indeed, Rizzo's opening brief fails to identify the "15 witnesses from France" or the substance of their purported testimony beyond conclusory statements that they are people who "know our family, who spent vacations with all of us, who came multiple times [to our] home" (emphasis omitted), and who would have rebutted all of Rampony's allegations. Furthermore, the record shows the three-day hearing provided Rizzo ample opportunity to refute Rampony's allegations with testimony and relevant documents. His counsel subjected Rampony and her witnesses to vigorous questioning.

Rizzo additionally claims he was denied due process because the judge was biased against him. In support of this claim, he asserted she unfairly credited Rampony's testimony and refused to hold a three-day hearing, which would have allowed him to bring witnesses from overseas. Due process guarantees the right to an impartial judge. (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 673.) Rizzo has not demonstrated bias on the part of the judge.

## DISPOSITION

The challenged domestic violence order is affirmed.


CURREY, J.


We concur:


MANELLA, P.J.


COLLINS, J.